

**SO ORDERED.**

**SIGNED this 10 day of August, 2011.**

_____
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| **BROOKE CORPORATION, et. al.,** | **CASE NO. 08-22786** |
| **DEBTORS.** | **(jointly administered)** |
| | **CHAPTER 7** |
| **ALBERT A. RIEDERER, Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc.,** | |
| **PLAINTIFF,** | |
| **v.** | **ADV. NO. 10-06246** |
| **Kutak Rock, LLP, et. al.,** | |
| **DEFENDANTS.** | |

### REPORT AND RECOMMENDATION TO THE DISTRICT COURT ON KUTAK ROCK, LLP'S  MOTION TO WITHDRAW REFERENCE

Pursuant to Local Rule 83.8.6, the Court makes the following recommendation that a decision on when to withdraw reference and whether the withdrawal should be as to all defendants, or just those defendants moving to withdraw reference, be deferred until after this Court has sua sponte supplemented this recommendation.

**FACTUAL AND PROCEDURAL BACKGROUND**.

Albert T. Riederer, the Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation, and Brook Investments, Inc., initiated this adversary proceeding against Kutak and others by filing a Complaint on October 27, 2010.  The instant case is one of approximately 84 separate adversary proceedings filed by the Trustee against approximately 460 defendants.  The case is one of 10 Complaints categorized by the Trustee as being in group D, described as a "catch-all miscellaneous category which encapsulates all other complaints that the Trustee filed.[1]

In this complex case, the Trustee seeks to recover from those alleged to have responsibility for the failure of Debtors.  The seventeen defendants include the former members of the board of Directors of Brooke Corporation and Brooke Capital Corporation (collectively referred to as "Brooke"), certain former officers of Brooke, entities engaged as security underwriters for Brooke stock offerings, and Kutak, a law firm engaged as counsel for Brooke.  The claims alleged against Kutak are:

---

[1] Case no. 8-22786, Dkt. No. 1650.

2

a. Count I – The Trustee seeks recovery in excess of $10,000,000.00 for Defendant's alleged legal malpractice;

b. Count II – the Trustee seeks recovery "in excess of millions of dollars" for Defendant's alleged role in aiding and abetting the Brooke Corporation's Board of Directors in breaching fiduciary duties;

c. Count III – The Trustee seeks recovery "in excess of millions of dollars" for Defendant's alleged breach of fiduciary duty;

d. Count IV – The Trustee seeks recovery "in excess of millions of dollars" against Defendant on a theory of deepening insolvency;

e. Count V – The Trustee seeks to avoid at least $202,804.17 in alleged preferential transfers pursuant to 11 U.S.C. § 547.

f. Count VI – The Trustee seeks to avoid at least $202,804.17 in alleged constructive fraudulent conveyances pursuant to 11 U.S.C. §§ 544 and 548(a)(1)(B) and K.S.A. §§ 33-204(2) and 33-205(a).

g. County VII – the Trustee seeks recovery of alleged fraudulent transfers and constructive fraudulent conveyances in an amount of at least $202,804.17 pursuant to 11 U.S.C. § 550.[2]

Kutak requests the immediate withdrawal of the entire case. Co-defendants Bryan C. Whipple, Chad S. Maxwell, Dane Devlin, and Kyle Garst, former directors of Brooke Franchise, also moved for withdrawal of reference as to all defendants, but delayed until after the case is ready for trial. The additional twelve defendants have not filed such a

---

[2] Dkt. no. 50, pp. 2-3

3

motion and have taken no position as to withdrawal.  The claims against all defendants arise from the same events.

Kutak was not served with summons until December 23, 2010.  On January 11, 2011, Kutak filed its Motion to Withdraw Reference and Transfer Proceedings to District Court (hereafter "Motion").[3]  The Trustee responded, requesting that the Court recommend that any withdrawal of reference be deferred until those claims triable to a jury are ready to be tried.[4]  The Trustee also stated that he reserves "his right to seek the severance of any claims and/or parties in the instant adversary proceeding,"[5] citing Fed. R. Civ. P. 42(b).  In a supplemental brief requested by the Court,[6] Kutak clarified its position initially stated at oral argument on the Motion, that withdrawal be immediate and that the entire case be withdrawn to the district court.[7]

---

[3] Dkt. no. 50.

[4] Dkt. no. 65.  The Trustee does not contend that the motion for withdrawal of reference of the demand for jury trial was not timely filed.

[5] *Id.,* p. 7.

[6] Dkt. 114.

[7] Dkt. 132.

4

**ANALYSIS.**

Kutak moves to withdraw reference under 28 U.S.C. § 157(d),[8] which provides in relevant part: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  The right to a jury trial has been recognized as cause for withdrawal of reference[9] "where (1) the claims concern matters for which there is a right to a jury trial; (2) a party timely demanded a jury trial; and (3) there is no mutual consent to trial before the bankruptcy court."[10]  District of Kansas Local Rule 83.8.13(a) declares that: "A district judge shall conduct jury trials in all bankruptcy cases and proceedings in which a party has a right to trial by jury, a jury is timely demanded, and no statement of consent to jury trial before a bankruptcy judge has been filed."

---

[8] In a subsequent brief submitted by Kutak in response to the Court's request that the parties address questions concerning the timing and extent of withdrawal of reference (dkt. 132), Kutak asserted than the case is also subject to mandatory withdrawal of reference pursuant to the second sentence of 28 U.S.C. §157(d), which provides, "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Kutak asserts that federal securities law issues are involved in the allegations of the Complaint, even though  not expressly stated, and therefore withdrawal of reference is mandatory. At this point in the proceedings the Court finds this basis for withdrawal of reference inapplicable as the Court cannot now determine whether consideration of federal securities law will be "substantial and material" as required for mandatory withdrawal. *In re Kuhlman Diecasting Co.*, 152 B.R. 310 (D. Kan. 1993).

[9] *E.g., Manley Truck Line, Inc. v. Mercantile Bank of Kansas City*, 106 B.R. 696 (D. Kan. 1989); see cases collected at 1 Collier on Bankruptcy ¶ 3.04[1][b] n.4 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 16th ed. 2011).

[10] *Rebein v. Kost*, 2006 WL 3842124, *1 (D. Kan. 2006), citing *Disbursing Agent of Murray F. Hardesty Estate v. Severson (In re Hardesty)*, 190 B.R. 653, 655 (D.Kan. 1995).

5

**A.  The Claims Against Defendant Concern Matters for which there is a Right to Trial by Jury.**

There is no doubt that there is a right to trial by jury as to all of the counts alleged in the Complaint against Kutak.  The Trustee does not argue otherwise.  Generally, the Seventh Amendment preserves the right to trial by jury as to the issues for which a legal remedy is available.[11] As to claims based upon the federal bankruptcy Code, the Seventh Amendment to the United States Constitution preserves the right to trial by jury in "suits at common law," meaning "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered."[12]  Federal law determines whether there is a right to a jury trial in a case involving state law that has been brought in federal court.[13] "[I]n such a circumstance, state law [regarding a right to jury trial] is wholly irrelevant."[14]

Kutak has a Seventh Amendment right to trial to a jury on the claims for legal malpractice, aiding and abetting, breach of fiduciary duty, and deepening insolvency. They are state law claims seeking recovery of money.[15]  Kutak is also entitled to jury trial on the three claims under 11 U.S.C. § 547 (avoidance of preferential transfers), avoidance

---

[11] *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962).

[12] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989), *quoting Parsons v. Bedford*, 3 Pet. 433, 447 (1830).

[13] *Simler v. Conner*, 372 U.S. 221 (1963).

[14] 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2303 (3rd ed. 2008).

[15] See *Dairy Queen, Inc. v. Wood*, 369 U.S. at 469.

of constructive fraudulent conveyances under 11 U.S.C. §§ 544 and 548 and K.S.A. §§ 33-204 and 33-205, and recovery of the avoided transfers under 11 U.S.C. § 550. They are claims to recover monetary relief which "would not have sounded in equity 200 years ago in England."[16] Kutak has not submitted to the jurisdiction of the bankruptcy court by filing a proof of claim.[17]

### B.  Defendant Timely Requested Trial by Jury.

Kutak included a demand for jury trial in the Motion, which was filed before an answer was due or filed.[18] Fed. R. Civ. P. 38(b) provides that on any issue triable by a jury, a party may demand a jury trial by serving the other parties with a written demand "no later than 14 days after the last pleading directed to the issue is served." In the Tenth Circuit, the demand for jury trial should be combined with the request to withdraw reference.[19] The demand was timely.

### C.  There is no Mutual Consent to Trial by Jury in this Court.

Kutak has not consented in writing to the Bankruptcy Court's conduct of a jury trial.

---

[16] *Granfinanciera,* 492 U.S. at 43.

[17] See *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990).

[18] Dkt. no. 50, p. 6.

[19] *In re Latimer*, 918 F.2d 136, 137 (10th Cir. 1990).

7

**D.  The Court Recommends that the Decision Whether to Withdraw Reference be Deferred until all Initial Pleadings have been Filed and the Court has Ruled on all Pending Motions to Dismiss.**

The Court requested supplemental briefing[20] and heard argument on questions of timing and the extent of withdrawal of reference.  That process clarified the status of this case.  There are seventeen defendants in this case: One, Kutak, seeks immediate withdrawal of reference of the entire case; four former directors, Bryan C. Whipple, Chad S. Maxwell, Dane Devlin, and Kyle Garst, seek withdrawal as to all defendants after the case is ready for trial; the three underwriters stated orally that the oppose withdrawal at this time; the nine remaining defendants have taken no position on withdrawal of reference; and the Plaintiff Trustee submits that withdrawal should be limited to only those defendants establishing cause pursuant to timely motions and that withdrawal should be delayed until the case is ready for trial.  At the time of the hearing, two motions to dismiss had been filed on behalf of four defendants.  The Court was informed that some defendants are engaged in serious settlement negotiations.  Answers have not been filed, and the extent of cross claims is unknown.  In other words, it is impossible at this time to predict the ultimate shape of litigation.

Because of these uncertainties and the disparate positions of the presently active defendants, the Court recommends that the decision concerning of withdrawal of reference of the claims against Kutak not be made at this time.  After all initial pleadings have been

---

[20] Dkt. 114.

filed and the Court has ruled on the pending motions to dismiss, the Court will sua sponte review the status of this case and supplement this recommendation.

**CONCLUSION.**

For the the three underwriters who oppose withdrawal at this time but favor later withdrawal; the nine remaining defendants have taken no position on withdrawal of reference foregoing reasons, the Court finds that there is cause for withdrawal of reference as to the claims against Kutak based upon Kutak's right to jury trial which was timely demanded.  This Court cannot conduct a jury trial, so withdrawal will be required before trial on the merits.  The Court recommends that a decision on when reference should be withdrawn and whether the claims against all defendants or fewer than all should be withdrawn be deferred until the status of the case is solidified.  The Court sua sponte will supplement this recommendation after all initial pleadings have been filed and pending motions to dismiss have been determined.

A copy of the Amended Complaint is attached for the convenience of the district court.

###

9

CATEGORY D

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS
### KANSAS CITY DIVISION

| | |
|---|---|
| *In re*: | |
| **BROOKE CORPORATION, et al.,** | **Case No. 08-22786-DLS** |
| | **(Jointly Administered)** |
| Debtors | **Chapter 7** |
| **ALBERT A. RIEDERER, Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation and Brooke Investments, Inc.,** | |
| **Plaintiff,** | |
| **vs.** | **Adv. No. 10-06246-DLS** |
| **KUTAK ROCK, LLP, a Nebraska Limited Liability Partnership;** | |
| **ROBERT D. ORR, ANITA LARSON, LELAND G. ORR, DERROL D. HUBBARD, JOE L. BARNES, JOHN L. ALLEN, SHAWN T. LOWRY, BRYAN C. WHIPPLE, CHAD S. MAXWELL, DANE DEVLIN, MITCHELL G. HOLTHUS, KYLE GARST, MICHAEL HESS;** | |
| **and** | |
| **SANDLER O'NEILL & PARTNERS, L.P. , a Delaware limited partnership, MACQUARIE HOLDINGS (USA) INC., a Delaware corporation, and OPPENHEIMER & CO. Inc. , a New York corporation,** | |
| **Defendants.** | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, Albert A. Riederer, Chapter 7 Trustee of Brooke Corporation,

Brooke Capital Corporation, and Brooke Investments, Inc. (collectively "Debtors"),  in his capacity

as Trustee and on behalf of Debtors' general unsecured creditors, and for his First Amended Complaint against Kutak Rock, LLP, Robert D. Orr, Anita F. Larson, Leland G. Orr, Derrol D. Hubbard, Joe L. Barnes, John L. Allen, Shawn T. Lowry, Bryan C. Whipple, Chad S. Maxwell, Dane Devlin, Mitchell G. Holthus, Kyle Garst, Michael Hess, Sandler O'Neill & Partners, L.P., Macquerie Holdings (USA) Inc., and Oppenheimer & Co. Inc., states and alleges as follows:

## Parties

1.      Plaintiff Albert A. Riederer ("Trustee") is the Chapter 7 Trustee of  Brooke Corporation ("Brooke Corp."), Brooke Capital Corporation ("Brooke Capital"), and Brooke Investments, Inc. ("Brooke Investments") (Brooke Corp. and Brooke Capital hereinafter collectively referred to as "Brooke").

2.      Defendant Kutak Rock, LLP ("Kutak") is a Nebraska limited liability partnership doing business in Kansas as a foreign limited liability partnership.  It may be served through its registered agent, David A. Jacobson, 1650 Farnam Street, Omaha, Nebraska 68102.

3.      Defendant Robert D. Orr is a Kansas resident.  He is the founder and former CEO of Brooke Corp. and was Chairman of the Brooke Corp. Board of Directors from 1991-2008.[1]

4.      Defendant Leland Orr is a Kansas resident and a former CEO of Brooke Corp. Leland Orr served on Brooke Corp.'s Board of Directors from 1996-2008, and was a member of the Audit Committee from 2001 until April 2004, when he was replaced by Joe Barnes.  Leland Orr also served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors from April 2006 through June 2007.

---

[1] Robert D. Orr is being sued solely in his capacity as a member of the Board of Directors of Brooke Corp., and any potential recovery against Robert Orr individually will be limited to available insurance proceeds, as detailed in the Order dated September 13, 2010 issued by the Honorable Dale L. Somers in the *In re Robert Dean Orr* Chapter 7 bankruptcy proceeding pending in the U.S. Bankruptcy Court for the District of Kansas, Wichita Division, Case No. 08-13242.

5.      Defendant Anita Larson is a Kansas resident and served on Brooke Corp.'s Board of Directors from January 2005 through July 18, 2007.

6.      Defendant Michael Hess is a Kansas resident and served on Brooke Corp.'s Board of Directors from 2004 through January 2005.

7.      Defendant Derrol Hubbard is a New Mexico resident and served on Brooke Corp.'s Board of Directors from January 2001 through March 2008.   Hubbard was also a member of the Audit Committee from 2003 until 2008.

8.      Defendant John Allen is a Kansas resident and served on Brooke Corp.'s Board of Directors from January 2001 through 2008.   Allen was also a member of the Audit Committee from 2003 until 2008.

9.      Defendant Joe Barnes is a Kansas resident and served on Brooke Corp.'s Board of Directors from April 2003 through 2008.   Barnes was also a member of the Audit Committee from 2003 until 2008.

10.     Defendant Shawn T. Lowry is a Kansas resident and served on Brooke Corp.'s Board of Directors from April 2006 through May 2007.  Lowry also served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors from 2004 through May 2007.

11.     Defendant Mitchell G. Holthus is a Kansas resident and served on Brooke Corp.'s Board of Directors from April 2006 through 2008.  Holthus also served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors from 2003 through 2006.

12.     Defendant Kyle Garst is a Kansas resident and served on Brooke Corp.'s Board of Directors from May 2007 through August 2007.   Garst also served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors from 2004 through 2008.

13.     Defendant Bryan C. Whipple is a Kansas resident and served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors from April 2006 through 2007.

14.     Defendant Chad S. Maxwell is a Kansas resident and served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors during 2007.

15.     Defendant Dane Devlin is a Kansas resident and served on Brooke Franchise Corporation's (later Brooke Capital) Board of Directors from 2004 through 2008.

16.     Defendant Sandler O'Neill & Partners, L.P. is a Delaware limited partnership. It may be served through its registered agent, The Prentice Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

17.     Defendant Macquarie Holdings (USA) Inc. is a Delaware corporation.  It may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

18.     Upon information and belief, Macquarie Holdings (USA) Inc. is the successor to Fox-Pitt Kelton Cochran Caronia Waller LLC ("Fox-Pitt Kelton").

19.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is a New York corporation. It can be served through its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

## Jurisdiction

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 328.

21.     Venue lies properly in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

## Facts Common To All Counts

### I.      Debtors' Bankruptcy Filings

22.     Brooke Corp. and Brooke Capital filed voluntary Chapter 11 petitions on October 28, 2008 in the United States Bankruptcy Court for the District of Kansas.

23.     Brooke Investments filed a voluntary Chapter 11 petition on November 3, 2008, in the United States Bankruptcy Court for the District of Kansas.

24.     On June 29, 2009, this Court entered an Order converting the Chapter 11 proceedings to Chapter 7 proceedings.

25.     This Court has entered orders directing the joint administration of the Debtors' three cases.

26.     As the representative of the bankruptcy estates, the Trustee is authorized to pursue all causes of action that belong to the estates as well as any applicable state law avoidance actions pursuant to 11 U.S.C. §§ 323(b) and 544(b).  The Trustee is also authorized to pursue causes of action on behalf of Debtors' general unsecured creditors.

### II.      The Nature and Structure of the Debtors' Businesses

27.     Brooke Corp. was a Kansas corporation headquartered in Kansas.  Brooke Corp. was a publicly traded company.  Brooke Corp. was a holding company listed on the NASDAQ Global Market under the symbol "BXXX".   Among other interests, Brooke Corp. owns 81 percent of Brooke Capital.  The majority of Brooke Corp.'s stock was owned by Brooke Holding Inc. ("BHI") which, in turn, was owned by the Orr family.

28.     Brooke Capital (formerly Brooke Franchise Corporation) is a Kansas corporation headquartered in Kansas.  Brooke Capital was also a publicly-traded company that was listed on the American Stock Exchange under the symbol "BCP."   Brooke Capital was an insurance

agency and finance company that distributed insurance services through a network of franchisee and company-owned locations.  At its peak in 2007-08, Brooke had over 900 franchise locations.

29.    Brooke Capital owns 100% of the stock of Brooke Investments.   Brooke Investments is a Kansas corporation headquartered in Kansas.

30.    Aleritas Capital Corp. ("Aleritas," formerly Brooke Credit Corp.) is a Delaware corporation headquartered in Kansas.  Aleritas was primarily engaged in the business of lending to Brooke franchisees and other insurance agents.

31.    The Debtors, and approximately thirty other affiliated companies, were engaged primarily in the business of selling insurance and related services through franchisees.

32.    Prior to 2001, most of Brooke's revenues were derived from sales commissions on the sale of property and casualty insurance policies through its franchisees, and consulting, lending and brokerage services provided to franchisees, funeral homes and Allstate insurance agencies.

33.    Brooke created new franchises in two ways: (1) converting an existing agency ("conversion franchise"), or (2) starting a new franchise ("SUP").

34.    In a typical conversion transaction, Brooke would identify a prospective independent insurance agency it hoped to convert into a Brooke franchise location.

35.    Brooke would then assist the seller to prepare the agency for sale and, at the same time, recruit prospective franchisees to purchase the agency.

36.    Once Brooke identified an interested buyer, Brooke and the buyer would enter into a franchise agreement and purchase agreement for the acquisition of the agency.

37.    In 2004, Brooke initiated its SUP franchise program.

38.     In a SUP transaction, Brooke would identify a prospective franchise location, and then assist the franchisee in opening the new location.

39.     Regardless of whether the franchisee obtained its franchise as a conversion franchise or a SUP franchise, every franchisee would enter into a franchise agreement with Brooke.

40.     Pursuant to the franchise agreements, franchisees agreed to pay Brooke franchise fees (including an Initial Franchise Fee for Basic Services ("Initial Franchise Fee") and Buyer Assistance Plan Fees ("BAP Fees") for other acquisition-related fees), and to share a percentage of their sales commissions with Brooke going forward.

41.     Both the costs associated with the acquisition of the agency and the franchise fees would typically be financed through Brooke's lending subsidiary, Aleritas.

42.     In return for payment of the Initial Franchise Fee and a share of the sales commission revenue, Brooke agreed to provide ongoing franchisor services throughout the life of the franchise relationship in accordance with the franchise program developed by Brooke, including:

> (a)     Training of all franchisees at Brooke's training academy;
>
> (b)     The use of Brooke's registered trade names;
>
> (c)     Establishing and maintaining contractual relationships with insurance carriers so that the franchisees had companies through which they could place coverage;
>
> (d)     Advertising services, including traditional advertising, direct mail advertising, yellow pages advertising, public relations, lead generation, and office location analysis, developing marketing programs, coordinating

advertising purchases, and conducting local, regional, and national advertising programs;

(e) An internet based document management system, including the storage and maintenance of records for the franchisee in an electronic database, and providing each franchisee with access to the electronic records related to the respective franchisee via the internet;

(f) Assisting franchisees in obtaining and maintaining their insurance licenses;

(g) Cash management services, including the billing and collection of insurance premiums, remitting premiums to the respective carriers, the receipt and allocation of commission revenues, the receipt and processing of agency related bills (including bills related to rent, utilities, advertising, service providers, etc.), the establishment and maintenance of trust accounts for the receipt and processing of premium and commission payments, and the provision of a monthly franchise statement reconciling all of the financial transactions affecting the franchisee's location each month; and

(h) Ongoing franchisee support through the national processing center (collectively referred to as "Franchisor Services").

### III.   Brooke's Unsustainable Business Model

43.     Brooke Corp. operated primarily through its operating subsidiaries:  Aleritas and Brooke Capital.

44.     During the first ten years of its existence, Brooke primarily sold administrative services to bank-owned insurance agencies.

45.     In 1996, Brooke established a franchise model for expansion and developed a lending program to facilitate acquisition of existing insurance agencies by Brooke franchisees.

46.     From 1996 to 2000, Brooke's revenues consisted almost entirely of a percentage of commissions earned by its franchisees, which Brooke retained in exchange for administrative services provided to the franchisees.

47.     In 2001, however, Brooke began to restructure its operations and create additional sources of revenue.  Specifically, it:

      (a)     began charging BAP Fees to prospective franchisees in conjunction with the franchisee's acquisition of a franchise; and

      (b)     began realizing gains on the sale of loans it had initiated and sold to participating banks.

48.     Starting in the fourth quarter of 2003, Brooke began, for the first time, charging its franchisees a significant Initial Franchise Fee for Franchisor Services in addition to the BAP Fees.

49.     Through the end of 2003, all Brooke franchises were conversion agencies, meaning that the franchisee owned or acquired an existing agency when it signed up to become a Brooke franchisee.

50.     Prior to 2003, Aleritas employed a business model whereby it would fund loans by selling participation interests in individual loans to a network of local banks.  In 2003, however, Aleritas started using loan securitizations as well as loan participations.  Loan securitizations involve a finance process that distributes risk by aggregating assets into a pool and issuing new securities backed by those assets and their cash flows.  The securities were then sold to investors.

51.     By the end of 2007, approximately 45% of the total loans Aleritas had initiated had been securitized into one of seven securitizations.  Aleritas was required to over-collateralize the securitizations, which meant Aleritas had to absorb the first 15-25% of losses in any given securitization before investors would lose any of their interest in the remaining percentage of the loan.

52.     Of the remaining unsecuritized loans that had been initiated by Aleritas, 35% had been sold without recourse to participating banks.  The remaining 20% remained unsold and on Aleritas's books.

53.     Notwithstanding Aleritas's apparent minimal exposure to the loans it had initiated, both Brooke and Aleritas were under tremendous pressure for all the loans to perform because their business model depended on a continuous stream of willing buyers for the loans.

54.     Between 2004 and 2007, Brooke experienced tremendous growth in the number of franchises.  The apparent success of a significant number of those franchises was, however, illusory.

55.     As noted earlier, Brooke began a program of start-up agencies in 2004.  In a SUP transaction, the franchisee was recruited and setup in a new franchise without the benefit of existing business.  Again, almost all of the costs for SUPs were financed through loans provided by Aleritas.

56.     In many instances, the commission revenues of Brooke franchisees in both conversion and SUP locations were not adequate to cover the franchisee's loan payments or other expenses.  Brooke absorbed the shortfalls and advanced funds to the franchisee to cover them.

57.     The success rate for SUPs was abysmal.  As of September, 2008, less than one-third of SUPs were able to timely meet their payment obligations.

58.     To keep pace with its rapid growth, Brooke's payroll costs increased very quickly to support, manage and control the rapidly growing franchise network.  Its other operating expenses increased even more dramatically, reflecting the cost of continued subsidization of an ever-growing portfolio of troubled franchises.

59.     Brooke was hemorrhaging excessive amounts of money as it subsidized the various expenses (including loan repayments) of underperforming franchises.  By 2007, these expenses had grown so dramatically that, even with an increase of 144 franchises that year, the Initial Franchise Fees were no longer sufficient to cover Brooke's other operating expenses.

## IV.     *Brooke's General Corporate Governance and Audit Committee*

60.     Brooke Corp. was governed by a Board of Directors.

61.     The Brooke Corp. Board of Directors had three committees: the Executive Committee, the Compensation Committee, and the Audit Committee.  The Audit Committee was formed in 2001.

62.     From 2001 until April 2004, the Audit Committee had three members: Leland Orr, Derrol Hubbard, and John Allen.

63.     The Audit Committee's primary responsibilities were to assist the Brooke Corp. Board of Directors in fulfilling its oversight responsibility to the shareholders relating to the integrity of Brooke's financial statements, to ensure Brooke's compliance with legal and regulatory requirements, and to ensure the qualifications, independence, and performance of Brooke's independent auditor.

64.     As it relates to the independent auditor, the Audit Committee was responsible for the appointment, compensation, retention and oversight of the work of the independent auditor

engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services for Brooke.

> *(a)     The Audit Committee's Decision Not to Designate a Financial Expert*

65.     Prior to 2004, the Audit Committee had not designated a "financial expert" member of the Audit Committee, because Brooke claimed that, as a small business filer, it was not required to have a "financial expert" on the Audit Committee.

66.     In 2004, Brooke lost its small business filer exemption under AMEX.

67.     As a result of the loss of its small business filer exemption, Brooke informed the Brooke Corp. Board of Directors that it was required to have an Audit Committee that consisted entirely of independent committee members, and was required to either (1) have a financial expert among its members, or (2) disclose in its public filings that it had not appointed a financial expert to serve on the Audit Committee.

68.     In correspondence dated January 10, 2004, Robert Orr expressed his reluctance to have a financial expert on the Audit Committee, and asked Brooke's in-house counsel to confirm that Brooke was required to have a financial expert on the Audit Committee.

69.     The requirement to have a financial expert on the Audit Committee was confirmed by Brooke's in-house counsel, Anita Larson, on January 10, 2004.

70.     In an e-mail dated January 15, 2004, Larson reversed her earlier opinion that the Audit Committee was required to have a financial expert.  Larson informed Robert Orr that Brooke was not required to have a financial expert on the Audit Committee so long as (1) Brooke disclosed in its public filings that it did not have a financial expert on the Audit Committee, and (2) the collective knowledge of the Audit Committee members satisfied the "various aspects of the definition of financial expert."

71.     Larson described the attributes of a financial expert to include an understanding of GAAP and financial statements; an ability to assess the general application of GAAP in connection with accounting for estimates, accruals, and reserves; experience preparing, auditing, analyzing, or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can be expected to come up with the company; an understanding of internal controls and procedures for financial reporting; and an understanding of Audit Committee functions.

72.     In an e-mail dated January 19, 2004, Robert Orr expressed his desire to delay, for as long as possible, the removal of his brother, Leland Orr, from the Audit Committee and the appointment of a third independent Audit Committee member.

73.     In a Memorandum to the Brooke Corp. Board of Directors dated January 20, 2004, Robert Orr recognized the requirement that the Audit Committee consist entirely of independent board members.  Orr explained that, in anticipation of this requirement, Joe Barnes was elected to the Brooke Corp. Board of Directors in 2003, and after the directors were elected at the next stockholder meeting, all three of the independent directors must serve on the Audit Committee.

74.     In the same Memorandum, Robert Orr also recognized that "the revised rules require that all independent board members on the Audit Committee be able to read and understand fundamental financial statements and that one independent board member of the Audit Committee be certified as financially sophisticated."

75.     Barnes was a physician practicing in Smith County, Kansas.  Barnes had no previous education or employment in the financial or accounting industry and did not satisfy any of the standards of a "financial expert."

76.     Orr went on to explain that AMEX's requirement that the Audit Committee have a financial expert was waived if the lack of a financially sophisticated independent committee member was disclosed in the annual proxy statement.

77.     In an e-mail dated January 22, 2004, one of Brooke's in-house attorneys advised Robert Orr and Anita Larson that both AMEX and Sarbanes Oxley required that Audit Committee chairs be "financially sophisticated" and Audit Committee members be "financially literate."

78.     In advance of Brooke Corp.'s annual meeting, Robert Orr proposed to Brooke Corp.'s Board of Directors that it not certify any Audit Committee member as financially sophisticated, but instead, disclose that it did not have a financially sophisticated independent board member serving on its Audit Committee.

79.     Orr also suggested that Brooke Corp.'s Board of Directors allocate funds to the Audit Committee for the purpose of "retaining an outside consultant to assist, educate, and advise the Audit Committee."

80.     On February 2, 2004, Brooke Corp. held its regular meeting of the Board of Directors.  All members of the Brooke Corp. Board of Directors attended the meeting.

81.     At the meeting, the Brooke Corp. Board of Directors discussed the issue of whether to have a financial expert on the Audit Committee.

82.     Robert Orr again suggested to the Brooke Corp. Board of Directors that instead of naming a financial expert to serve on the Audit Committee, the Audit Committee should just be given authority to retain outside financial consultants, including the retention of an independent, qualified, financial expert consultant, to assist it in fulfilling its duties.

83.     Robert Orr asked the Brooke Corp. Board of Directors to consider retaining such a financial expert consultant to assist the Audit Committee and stated that Brooke would ensure that the Audit Committee had funds to pay for financial expert consulting services.

84.     Brooke Corp.'s Board of Directors did not designate a financial expert on the Audit Committee.

85.     Instead of appointing a financial expert to serve on the Audit Committee, Brooke Corp.'s Board of Directors opted to disclose that it did not have a financial expert serving on its Audit Committee.  The disclosure, contained in Brooke's SEC filings, stated:

> The members of the Audit Committee have owned and/or have participated in the management of businesses.  The Audit Committee members' combined financial acumen is strong, and therefore, an Audit Committee financial expert is not necessary for a proficient discharge of all Audit Committee responsibilities to the Company's Board of Directors and Shareholders.  Specifically, the Board believes that the current members of the Audit Committee as a group have an understanding of audit committee functions, have the ability to understand financial statements and generally accepted accounting principles, have substantial business experience that results in financial sophistication, have the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves and have an understanding of internal controls and procedures for financial reporting.  In addition, the Committee's Charter grants the Audit Committee authority to retain advisors with financial expertise at the Company's expense.  The Company's controlling shareholder and the Company's Board of Directors have encouraged the Audit Committee to retain such advisors that the Audit Committee, in its sole discretion, feels that such expertise is needed, or desired, and have encouraged the selection of advisors who met the independence standards applicable to independent directors.

86.     Along with the Brooke Corp. Board of Directors, Kutak also knew that there was not a "financial expert" on the Audit Committee.

87.     Kutak was retained as Brooke's legal counsel as early as 2004 to provide broad and wide ranging legal advice regarding issues such as corporate governance, compliance with

applicable securities laws and regulations, SEC reporting requirements, securitization issues, and other legal issues related to the overall operation of Brooke's business.

88.      On or around March 16 through March 18, 2005, Kutak performed a due diligence review of Brooke in connection with a proposed public offering of Brooke common stock.

89.      As part of the due diligence review, Kutak reviewed Brooke "documents used or received by [Brooke] for purposes of determining whether directors . . . qualify as 'financial experts' for Audit Committee purposes . . . ."

90.      Moreover, Kutak drafted, edited, and reviewed a Form S-1 Registration Statement filed by Brooke with the SEC on April 21, 2005, in connection with the public offering ("2005 S-1"), which stated:

> Our board of directors has determined that none of its members qualifies as an audit committee financial expert as defined by applicable Securities and Exchange Commission regulations. The reason that our board of directors has not appointed an audit committee financial expert is because we believe that the current members of our audit committee as a group have an understanding of audit committee functions, have the ability to understand financial statements and generally accepted accounting principles, have substantial business experience that results in financial sophistication, have the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves and have an understanding of internal controls and procedures for financial reporting. Our audit committee's charter grants the audit committee authority to retain advisors with financial expertise at our expense. Our controlling shareholder and board of directors have encouraged our audit committee to retain such advisors if our audit committee, in its sole discretion, believes that such expertise is needed, or desired, and have encouraged the selection of advisors who meet the independence standards applicable to independent directors.

91.      Nevertheless, Kutak failed to advise Brooke Corp.'s Board of Directors of the legal risks associated with not having a "financial expert" on the Audit Committee.

> (b)     *The Brooke Corp. Board of Directors' Failure to Make An Informed Decision Regarding the Competence of Brooke's External Auditors and the Accuracy of Brooke's Financial Statements*

92.     On March 20, 2004, Robert Orr wrote a memo to the Audit Committee.  In that memo, Orr recognized internal shortcomings in the accounting department and acknowledged that the accounting department must improve in certain areas and that additional qualified accounting personnel were required to make those improvements.

93.     On March 22, 2004, a telephonic meeting of the Audit Committee was held.  At that meeting, the Audit Committee members discussed the use of Summer, Spencer & Callison, CPA's Chartered ("SSC") as Brooke's external auditors.  Mr. Allen asked if it mattered if the Company used a "big name firm" to perform its audit and the potential impact on investor confidence.  Leland Orr noted that this was a potential concern, and that in the future, Brooke may want to consider retaining a big name firm.

94.     A "big name firm" was never retained, nor was it ever addressed again by the Audit Committee.

95.     Furthermore, the Audit Committee did not perform any due diligence prior to retaining SSC to serve as Brooke's external auditor for 2004 or do anything else to determine whether SSC had any experience auditing publically traded companies or franchisors.

96.     In early April 2004, Brooke filed its preliminary proxy statement and notice of 2004 annual meeting to be held on April 22, 2004.

97.     Among the issues to be voted on at the annual meeting were (1) the election of six directors to the Brooke Corp. Board of Directors, and (2) the selection of SSC to serve as Brooke's independent auditor for the fiscal year ending December 31, 2004.

98.     The preliminary proxy described certain corporate governance and board matters, including changes to the Audit Committee.

99.     The Preliminary Proxy stated:

> During 2003, the Audit Committee was comprised of three members: John Allen, Derrol Hubbard, and Leland Orr.  John Allen and Derrol Hubbard are independent, as that term is defined by the American Stock Exchange LLC; therefore, the Audit Committee composition was compliant with the requirements applicable to small business filers.  However, at the Board of Directors' Annual Meeting, the composition of the Audit Committee will change in that, if all nominees are elected, it will become entirely comprised of independent directors.

> The Company has not designated an "audit committee financial expert." All members of the Audit Committee have owned and/or have participated in the management of businesses.  The audit committee members' combined financial acumen is strong, and therefore, an Audit Committee financial expert is not necessary for a proficient discharge of all Audit Committee responsibilities to the Company's Board of Directors and shareholders.  Specifically, the Board believes that the current members of the Audit Committee as a group have an understanding of Audit Committee functions, have the ability to understand financial statements and generally accepted accounting principles, have substantial business experience that results in financial sophistication, have the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves and have an understanding of internal controls and procedures for financial reporting.  In addition, the Committee's Charter grants the Audit Committee authority to retain advisors with financial expertise at the Company's expense.  The Company's controlling shareholder and the Company's Board of Directors have encouraged the Audit Committee to retain such advisors if the Audit Committee, in its sole discretion, feels that such expertise is needed, or desired, and have encouraged the selection of advisors who meet the independence standards applicable to independent directors.

100.    Brooke's 2004 annual meeting was held on April 26, 2004.

101.    On the recommendation of Brooke Corp.'s Board of Directors, SSC was selected to serve as Brooke's independent auditor for the fiscal year ending December 31, 2004, and Robert Orr, Leland Orr, Michael Hess, Derrol Hubbard, John Allen, and Joe Barnes were elected to serve on Brooke Corp.'s Board of Directors.

102.    Likewise, Brooke Capital's Board of Directors selected SSC to serve as Brooke Capital's external auditors.

103.    At the annual meeting in 2004, Brooke Corp.'s Board of Directors amended the Charter of the Audit Committee of the Board of Directors of Brooke Corp.

104.    Pursuant to the Amended Charter Agreement, Brooke acknowledged that "the Board of Directors will also take such necessary steps to appoint a 'financial expert' or disclose in the Company's annual report the fact that the Audit Committee and Board of Directors do not have a 'financial expert' in accordance with the Sarbanes-Oxley Act and AMEX requirements."

105.    The Charter Agreement also noted:

> The primary function of the Audit Committee is to assist the Board of Directors in fulfilling its oversight responsibilities for financial matters, which includes, assisting the Board in the specific oversight of the integrity of the financial statements of Brooke, of Brooke's compliance with legal and regulatory requirements, of the independence and qualifications of the independent auditor, and of the performance of the company's internal audit function and independent auditors.

> In so doing, the responsibility of the Audit Committee to maintain free and open means of communication between the Directors, the independent auditors, the internal auditors, and the financial management of the corporation.

> **Powers and Responsibilities**

> The power to recommend the accounting firm to engage as the company's independent auditor.  Factors considered in making that recommendation include, but are not limited to, the auditor's independence, effectiveness, and fees.

> The power to review the results of each external audit, including any qualification in the external auditor's opinion, any related management letter, management's responses to recommendations made by the external auditor in connection with the audit, reports submitted to the Audit Committee by the internal auditing department that are material to the Company as a whole, and managements responses to those reports.

> The responsibility to investigate any matter brought to its attention within the scope of its duties, with the power to retain outside counsel, experts

and other advisors as the Committee may deem appropriate in its sole discretion for the purpose if, in its judgment, that is appropriate.  The Committee shall have sole authority to approve related fees and retention terms.

106.    On April 22, 2004, Barnes replaced Leland Orr on the Audit Committee.

107.    At the same time that Barnes replaced Leland Orr on the Audit Committee, the Brooke Corp. Board of Directors acknowledged that none of the members of the Audit Committee qualified as a "financial expert," as that term is defined by SEC regulations.

108.    Pursuant to its appointment as Brooke's independent auditor, SSC conducted an audit and prepared Brooke's financial statements for the fiscal year ending December 31, 2004.

109.    In connection with Brooke's 2004 Form 10-K Annual Report ("2004 10-K"), SSC issued its opinion to the Brooke Corp. Board of Directors on March 4, 2005 stating:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Brooke Corporation at December 31, 2004 and 2003, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.

110.    The 2004 financial statements were the first statements that recognized Initial Franchise Fee revenue.

111.    From 2005 through 2008, at Brooke Corp's annual meetings, the Audit Committee continually recommended, and the Brooke Corp. Board of Directors approved, the selection of SSC to perform Brooke's annual audit.

112.    Likewise, from 2005 through 2008, Brooke Capital's Board of Directors approved SSC to serve as Brooke Capital's external auditors.

113.    From 2005 through 2008, the Audit Committee repeatedly recommended that the financial statements prepared by SSC be incorporated into the Company's annual filings.

114.     In each year from 2005-2008, SSC issued an opinion similar to its 2004 opinion that Brooke's consolidated financial statements presented fairly, in all material respects, the financial position of Brooke and conformed to GAAP.

115.     Neither Brooke nor the Audit Committee ever conducted any due diligence related to SSC, including whether SSC had ever audited a publicly-traded company or whether it had any experience auditing a franchisor.  Nevertheless, the Brooke Corp. and Brooke Capital Board of Directors continually recommended SSC's appointment.

116.     Despite the fact that the Audit Committee was responsible for (1) the integrity and accuracy of the Brooke's financial statements, and (2) ensuring that Brooke complied with all legal and regulatory requirements (including GAAP), and the fact that (3) no member of the Audit Committee was a "financial expert," the Audit Committee did not retain an outside financial consultant to help it interpret and understand the financial statements prepared by SSC, including the appropriateness of Brooke's recognition of all Initial Franchise Fee revenue in the year it was received or the appropriateness of Brooke's failure to properly record loan loss reserves associated with franchisees who were unable to service their debt.  In fact, there is no record that the Audit Committee ever even considered retaining an outside financial consultant to assist them from 2004-2008.

117.     Likewise, neither the Brooke Corp. nor Brooke Capital Board of Directors insisted that the Audit Committee retain an outside financial consultant to help it interpret and understand the financial statements prepared by SSC.

118.     Accordingly, the Audit Committee, Brooke Corp.'s Board of Directors, and Brooke Capital's Board of Directors had no idea whether the financial statements prepared by

SSC accurately reflected Brooke's financial position or complied with relevant legal and regulatory requirements, including GAAP.

119.    With no appreciation for the competence or quality of SSC's auditing work, and despite the Audit Committees' concern regarding SSC's qualifications and competence, the Audit Committee, the Brooke Corp. Board of Directors, and the Brooke Capital Board of Directors continued to appoint SSC as their external auditors.

120.    Nevertheless, each year, from 2004 through 2008, the Audit Committee continually recommended to the Brooke Corp. Board of Directors that it incorporate the financial statements for the respective years, which were audited by SSC and which represented that the financial statements accurately reflected the financial condition of Brooke, be included in Brooke's annual report.

121.    As a result, Brooke's financial statements, which were included in its quarterly and annual filings with the SEC, and, as more fully set forth below, were in violation of GAAP and relevant SEC guidelines, resulted in material misrepresentations of Brooke's financial condition.

## V.    *Brooke's Improper Accounting Practices and Its False Appearance of Solvency*

122.    In various SEC filings and disclosures, Brooke reported significant amounts of equity.  This equity was, however, an illusion resulting from, among other things, Brooke's improper accounting practices.

123.    As discussed in further detail below, Brooke's methodology for calculating loan loss reserves for franchisees that were unable to pay their loan obligations ignored the actual cash flows and financial condition of the underlying franchise, as required under GAAP, but instead relied on improper delinquency statistics created by Brooke.

124.    Especially important, Brooke did not recognize Initial Franchise Fee revenue over the expected life of the franchise relationship, as required under GAAP and relevant SEC guidelines, but instead recognized all Initial Franchise Fee revenue at the inception of the franchise relationship despite the fact that Brooke had a continuing obligation to provide Franchisor Services in exchange for payment of Initial Franchise Fees.

125.    If Brooke had properly followed GAAP and relevant SEC guidelines, its equity for 2003 through 2007 would have been as follows:

|  | 2003 (millions) | 2004 (millions) | 2005 (millions) | 2006 (millions) | 2007 (millions) |
|---|---|---|---|---|---|
| **Equity** | -$9.5 | -$23.1 | -$44.5 | -$96.8 | -$67.9 [2] |

126.    Succinctly stated, the Debtors were continuously insolvent from at least 2003 through their respective bankruptcy filings.

(a)    *Brooke's Failure to Properly Record Loan Loss Reserves*

127.    Prior to September 30, 2007, Brooke had never recorded any reserve for franchise loan losses.  This appears to have been justified on the basis that loans were typically kept for only six to nine months before being sold or securitized and that only very small amounts of loan losses had been recorded in the past.

128.    As a result of an increase in the number of delinquencies and Brooke's intention to hold franchise loans for up to a year, Brooke established a loan loss reserve of $0.8 million at September 30, 2007 and $1.7 million at December 31, 2007.

---

[2] The decline in negative equity during 2007 is not the result of any improvement in Brooke's financial condition but rather a reflection of the fact that during the year, Brooke sold 38% of its interest in Aleritas and 19% of its interest in Brooke Capital so that at year end a substantial portion of the negative equity was allocated to the holders of those minority interests in Brooke's two largest subsidiaries.

129.    Brooke calculated the above reserves as 10% of "impaired" funeral home loans and 15% of "impaired" franchise loans plus 0.5% of unimpaired loans.   Brooke defined "impaired" as past-due over 60 days for funeral home loans and conversion franchise loans and past-due over 120 days for SUP loans.

130.    Under GAAP, loan loss reserves should be established if it is probable that the company will be unable to collect all amounts due (principal and interest) on franchise loans and the amount of loan loss reserves should typically be based on the present value of expected future cash flow for the respective franchise.

131.    Brooke's methodology for calculating loan loss reserves ignored the actual cash flows and financial condition of the underlying franchise, and was improper under GAAP.

132.    Had Brooke properly measured the extent of the impairment of SUP and conversion franchises based on the franchise's ability to pay its loan obligations, and not on Brooke's improper delinquency statistics, the resulting estimates of the required allowances would have been $45.2 million, $46.7 million and $10.8 million as of December 31, 2007, 2006 and 2005, respectively.

133.    Additionally, had Brooke properly recognized the risks and defaults associated with franchisee loans, Brooke's related recognition of Income Strip Receivable revenue would have been impaired, further impacting Brooke's reported financial results.

> (b)    *Brooke's Improper Recognition of Initial Franchise Fee Revenue*

134.    Once Brooke began to charge its franchisees a significant Initial Franchise Fee in the fourth quarter of 2003, revenue from Initial Franchise Fees rapidly became the focus at Brooke and the driver behind Brooke's reported financial results.

135.    In 2003, Brooke received $425,000.00 in Initial Franchise Fees.

24

136.   By 2004, Initial Franchise Fee revenue had increased to $8,795,000.00.

137.   In Brooke's 2004 10-K filed with the SEC, Brooke recognized the growing significance that Initial Franchise Fees played:

> ***Our dependence on initial fees creates an incentive for us to extend credit to borrowers that may not meet stringent underwriting guidelines.***
>
> A significant part of our revenues are derived from one time initial fees we receive from assisting franchisees and others with the acquisition of businesses. Generating fees is largely dependent on our franchisees' and others' ability to obtain acquisition financing from Brooke Credit. Our dependence on these initial fees creates an incentive for us to extend credit to borrowers that may not meet stringent underwriting criteria. Our failure to follow stringent underwriting guidelines could adversely affect the quality of the loans we make and adversely affect our financial condition and results of operations.

(Emphasis in the original).

138.   As part of its engagement with Brooke, Kutak drafted, edited, and reviewed Brooke's various SEC filings, including the 2004 10-K and the 2005 S-1.

139.   In the 2004 10-K and 2005 S-1, Brooke stated the following regarding Initial Franchise Fees:

> **Initial Franchise Fees for Basic Services** A certain level of basic services is initially provided to all franchisees, whether they acquire an existing business and convert into a Brooke Franchise or whether they start up a new Brooke Franchise.  These basic services include services usually provided by other franchisors, including a business model, use of a registered trade name, access to suppliers and license for an internet based management system.  The amount of the initial franchise fees typically paid for basic services is $125,000 . . . .  Revenues from initial franchise fees for basic services are recognized immediately because Brooke Franchise has no continuing obligation.

(emphasis in the original).

140.   In the consolidated financial statement included in the 2004 10-K, Brooke reported Initial Franchise Fee revenue of $8,795,000.00.  This was the first time Initial Franchise Fee revenue was reported, and represented 100% of the Initial Franchise Fees paid in 2004.  In

other words, Brooke realized all of the Initial Franchise Fee revenue in the year it was received, and did not defer or amortize any of the revenue.

141.    Brooke continued its practice of recognizing 100% of the Initial Franchise Fee revenue in the year it was received for 2005, 2006, 2007, and 2008.

142.    On May 12, 2005, the SEC sent Brooke a letter outlining numerous questions regarding Brooke's financial statements and related disclosures in Brooke's 2004 10-K ("May 12 SEC Letter").   The SEC asked for, among other things, an expanded disclosure of Brooke's revenue recognition policies and procedures relating to Initial Franchise Fee revenue.

143.    Kutak was deeply involved in crafting Brooke's response to this request.   Kutak reviewed, edited, and even drafted portions of Brooke's response.

144.    On May 31, 2005, Brooke responded to the May 12 SEC Letter.   With respect to its revenue recognition policies and procedures, Brooke stated as follows:

> The initial franchise fees for basic services cover the franchisees' access to the registered name "Brooke," access to suppliers, and access to the company's internet-based management software program.   These basic services are the types of services typically provided by franchisors. Delivery of these services is substantially complete when the franchise location is open.   Therefore, all such revenues are immediately recognized.

145.    On June 24, 2005, the SEC sent Brooke a letter outlining numerous questions regarding Brooke's financial statements and related disclosures in Brooke's 2004 10-K ("June 24 SEC Letter").   The SEC asked for, among other things, an explanation of how Brooke's revenue recognition policies and procedures relating to Initial Franchise Fee revenue complied with financial accounting standards.

146.    On July 1, 2005, Brooke responded to the June 24 SEC Letter.   Brooke provided the following explanation of how its revenue recognition policies and procedures relating to Initial Franchise Fee revenue complied with financial accounting standards:

> *Our accounting for BAP related initial franchise fees complies with [financial accounting standards] because all consulting services are substantially performed when initial franchise fees are paid at closing.*

(emphasis in the original).

147.    Interestingly, Brooke's response only discussed the accounting for BAP Fees, and completely ignored the recognition of Initial Franchise Fees.

148.    Kutak was deeply involved in crafting Brooke's response to the June 24 SEC Letter.  Kutak reviewed, edited, and even drafted portions of Brooke's response to the June 24 SEC Letter.

149.    On July 28, 2005, Brooke filed an amended 2004 10-K.

150.    In the amended 2004 10-K, Brooke again made the following statement regarding Initial Franchise Fees:

> **Initial Franchise Fees for Basic Services** A certain level of basic services is initially provided to all franchisees, whether they acquire an existing business and convert into a Brooke Franchise or whether they start up a new Brooke Franchise.  These basic services include services usually provided by other franchisors, including a business model, use of a registered trade name, access to suppliers and license for an internet based management system.  The amount of the initial franchise fees typically paid for basic services is $125,000 . . . .  Revenues from initial franchise fees for basic services are recognized immediately because Brooke Franchise has no continuing obligation.

(emphasis in the original).

151.    Kutak provided legal advice to Brooke regarding the amended 2004 10-K and assisted Brooke in drafting, editing, and filing the amended 2004 10-K.

152.    The same statement, or a substantively similar statement, as that made in the amended 2004 10-K regarding Brooke's recognition of Initial Franchise Fee revenue was also made by Brooke in its 2005 10-K Annual Report filed with the SEC on March 13, 2006 ("2005

10-K"), in its 2006 10-K Annual Report filed with the SEC on March 6, 2007 ("2006 10-K"), and in its 2007 10-K Annual Report filed with the SEC on March 17, 2008 ("2007 10-K").

153.    Kutak provided legal advice to Brooke regarding the 2005 10-K, the 2006 10-K, and the 2007 10-K, and assisted Brooke in drafting, editing, and filing the 2005 10-K, the 2006 10-K, and the 2007 10-K.

154.    Despite its statements to the contrary, Brooke, in fact, had significant continuing obligations in providing Franchisor Services.  Indeed, payment of Initial Franchise Fees was made in exchange for substantial Franchisor Services provided by Brooke on an ongoing basis and throughout the franchise relationship.

155.    For example, as part of the Franchisor Services, Brooke:

    (a)    Established and maintained contractual relationships with insurance carriers on behalf of franchisees so that franchisees had companies through which they could place coverage;

    (b)    Provided advertising services, including traditional advertising, direct mail advertising, yellow pages advertising, public relations, lead generation, and office location analysis, developing marketing programs, coordinating advertising purchases, and conducting local, regional, and national advertising programs; and

    (c)    Provided cash management services, including the billing and collection of insurance premiums, remitting premiums to the respective carriers, the receipt and allocation of commission revenues, the receipt and processing of agency related bills (including bills related to rent, utilities, advertising, service providers, etc.), the establishment and maintenance of trust

accounts for the receipt and processing of premium and commission payments, and the provision of a monthly franchise statement reconciling all of the financial transactions affecting the franchisee's location each month.

156.    Kutak knew that Brooke had a continuing obligation to provide Franchisor Services over the life of the franchise relationship.

157.    As Brooke put it,

> For an initial franchise fee and a share of sales commissions or other revenues, the Company provides franchisor services to its franchisees in accordance with a franchise program pioneered by the Company.

158.    Pursuant to GAAP and relevant SEC guidelines, Initial Franchise Fee revenue must be systematically recognized over the expected life of the franchise relationship. The reason for this, among other things, is the franchisor's continuing obligation to provide various services to franchisees.

159.    Despite regulations to the contrary, Brooke fully recognized all revenue from Initial Franchise Fees at the inception of the franchise relationship.

160.    Brooke's policy of fully recognizing Initial Franchise Fee revenue at the inception of the franchise relationship constituted a clear violation of GAAP and relevant SEC guidelines.

161.    At the time Kutak provided legal advice to Brooke and drafted, edited, and reviewed Brooke's various SEC filings (including the 2004 10-K, amended 2004 10-K, 2005 10-K, 2006 10-K, 2007 10-K and various SEC response letters), Kutak knew that (1) contrary to GAAP and SEC guidelines, Brooke was recognizing all revenue from Initial Franchise Fees in the year that those fees were received, rather than systematically recognizing this revenue over the expected life of the franchise relationship, and (2) Brooke had a continuing obligation to provide Franchisor Services over the life of the franchise relationship.

162.    At the time Kutak provided legal advice to Brooke and drafted, edited, and reviewed Brooke's various SEC filings, Kutak knew or should have known that Brooke's practice of recognizing Initial Franchise Fee revenue at the inception of the franchise relationship constituted a clear violation of GAAP and relevant SEC guidelines, would result in Brooke appearing to have more equity (and revenues) than it really did, and would result in material misrepresentations regarding Brooke's financial condition, but did not alert Brooke or the Brooke Corp. Board of Directors to the legal significance of these facts.

163.    Kutak knew or should have known that properly recognizing Brooke's Initial Franchise Fee revenue would reveal that Brooke was insolvent as early as 2003, but did not alert Brooke or the Brooke Corp. Board of Directors to this fact.

164.    Kutak did not inform Brooke or the Brooke Corp. Board of Directors that Brooke was making materially false statements in both its SEC filings and its responses to SEC inquiries regarding its obligation to provide significant continuing services to franchisees over the life of the franchise agreements.

165.    Kutak's failure to alert Brooke or the Brooke Corp. Board of Directors to the above issues regarding its recognition of Initial Franchise Fee revenue resulted in lenders and investors mistakenly believing that Brooke was solvent.

166.    Indeed, if Brooke had properly deferred the Initial Franchise Fees and amortized them on a straight-line basis, the result would have been a cumulative reduction of approximately $109.6 million in recorded revenue through the end of 2007, resulting in a cumulative net loss of revenue of $56.4 million from 2003-2007.

167.    If Brooke's net income was properly adjusted, it would have reported a negative net income from 2004-2008, and would have shown that Brooke was insolvent from 2004-2008.

168.    Because of the improper recognition of Initial Franchise Fee revenue, Brooke represented itself to be solvent, when in fact, it was insolvent.

169.    Between 2004 and 2008, and based on, in part, Brooke's failure to record loan loss reserves and its improper recognition of Initial Franchise Fee revenue, Brooke took on additional debt, and went from a company that was on the brink of solvency to a company that has over $450 million in claims against it and its affiliates.

> (c)    *Brooke's Cash Management and Payment of Franchisee Monthly Expenses*

170.    Among the Franchisor Services Brooke provided to its franchisees in exchange for the Initial Franchise Fee and a share of ongoing commission revenue was franchisee cash management services.

171.    In addition to the debt service on the loan the franchisees obtained to acquire their franchise, the franchisees had a number of other monthly expenses for which they were obligated to pay.  For example, the franchisees had to pay for the lease on their office space, utility expenses, payroll expenses, Brooke's share of the franchisee's commission revenue, marketing/advertising fees, licensing fees, etc. (collectively referred to as "Monthly Expenses").

172.    Most of the individual franchisee expenses, including the franchisee's Monthly Expenses, were processed through Brooke's cash management center in Phillipsburg, Kansas.

173.    All of the money collected by a franchisee for policy premiums would be collected into a consolidated account at Brooke.  The premiums would then be sent to the respective carriers who issued the policies, and any commissions earned on the premiums would be returned to Brooke.

174.     Brooke would then allocate the commission revenue to the appropriate franchisee and, after deducting the franchisee's Monthly Expenses, Brooke would send the franchisee any remaining balance.

175.     A franchisee's sole source of revenue was the commissions generated by the sale of insurance.

176.     By 2004, an increasing number of franchisees were having difficulty paying their Monthly Expenses because their commission revenue was not sufficient to cover the franchisee's Monthly Expenses.

177.     The Monthly Expenses were all expenses and obligations of the respective franchisees.

178.     To the extent the franchisee's commission revenue was not sufficient to cover its Monthly Expenses, Brooke would cover the shortfall and record a statement balance owed by the franchisee.

179.     Brooke touted its cash management system as one of its greatest strengths and something that set it apart from its competitors.  In its public filings, Brooke claimed that its cash management system allowed Brooke to better monitor franchisee business performance, identify negative operating trends, preserve collateral, and, when necessary, mitigate losses.

180.     Brooke disclosed in its public filings its practice of making advances to franchisees either as part of its "cash management services" or its provision of "additional assistance to franchisees coping with financial stress . . ." or "cyclical fluctuations of revenues, receivables and payables with commission advances recorded on franchisees' monthly statements and granting temporary extensions of due dates for franchise statement balances . . . ."

181.    By the end of 2004, there was $4,359,000.00 in outstanding statement balances due from individual franchisees, $1,576,000.00 of which had been due and outstanding for more than 120 days.

182.    Despite the significant demand on Brooke's cash flow, Brooke's practice of paying the franchisee's monthly shortfalls continued, and Brooke recorded outstanding statement balances of $4,047,000.00, $6,214,000.00, and $9,662,000.00 at year-end in 2005, 2006, and 2007, respectively.

183.    Brooke did little, if anything, to recover the outstanding statement balances from franchisees or the franchisee's noteholders.   In fact, Brooke would periodically write-off statement balances due from individual franchisees.   As a result, the outstanding statement balances Brooke disclosed in its filings likely dramatically underestimated the actual amount of statement balances due from franchisees and/or the noteholders.

184.    Despite the fact that Brooke was not being reimbursed for its payment of the franchisees' Monthly Expense shortfalls, and despite the fact that Brooke's payment of these expenses was disclosed in its quarterly and annual filings, Brooke Corp.'s Board of Directors never discussed the use of Brooke's cash to satisfy the franchisees' Monthly Expenses.

185.    Instead, Brooke Corp.'s Board of Directors permitted Brooke to continue its practice of paying Monthly Expenses and wasting Brooke's assets.

### VI.    The Brooke Corp. Board of Directors' Improper Declaration of Dividends

186.    Pursuant to K.S.A. § 17-6420, the directors of a corporation may declare and pay dividends upon the shares of its capital stock either (1) out of its surplus, or (2) in case there is no surplus, out of its net profits for the fiscal year in which the dividend is declared.

187.    Between February 2003 and January 2008, Brooke Corp.'s Board of Directors declared and paid numerous cash dividends on the Company's common stock:

**CATEGORY D**

(a)     On February 18, 2003, Brooke Corp.'s Board of Directors declared a $.15/share quarterly cash dividend on the Company's common stock, which was paid shortly thereafter, and awarded each shareholder five additional shares of common stock dividend for each share owned;

(b)     On May 8, 2003, Brooke Corp.'s Board of Directors declared a $.08/share quarterly cash dividend on the Company's common stock, which was paid on May 12, 2003;

(c)     On September 19, 2003, Brooke Corp.'s Board of Directors declared a $.10/share quarterly cash dividend on the Company's common stock, which was paid on October 6, 2003;

(d)     On October 24, 2003, Brooke Corp.'s Board of Directors declared a $.10/share quarterly cash dividend on the Company's common stock, which was paid on November 10, 2003;

(e)     On February 4, 2004, Brooke Corp.'s Board of Directors declared a $.20/share quarterly cash dividend on the Company's common stock, which was paid on February 26, 2004;

(f)     On April 22, 2004, Brooke Corp.'s Board of Directors declared a $.20/share quarterly cash dividend on the Company's common stock, which was paid on May 20, 2004;

(g)     On July 30, 2004, Brooke Corp.'s Board of Directors declared a $.10/share quarterly cash dividend on the Company's common stock, which was paid on August 25, 2004;

(h)     On August 3, 2004, Brooke Corp.'s Board of Directors declared a $.15/share special cash dividend on the Company's common stock, which was paid on August 30, 2004;

(i)     On October 26, 2004, Brooke Corp.'s Board of Directors declared a $.10/share quarterly cash dividend on the Company's common stock, which was paid on November 22, 2004;

(j)     On January 31, 2005, Brooke Corp.'s Board of Directors declared a $.16/share quarterly cash dividend on the Company's common stock, which was paid on February 23, 2005;

(k)     On April 29, 2005, Brooke Corp.'s Board of Directors declared a $.16/share quarterly cash dividend on the Company's common stock, which was paid on May 27, 2005;

(l)     On July 27, 2005, Brooke Corp.'s Board of Directors declared a $.16/share quarterly cash dividend on the Company's common stock, which was paid on August 25, 2005;

(m)     On October 27, 2005, Brooke Corp.'s Board of Directors declared a $.16/share quarterly cash dividend on the Company's common stock, which was paid on November 22, 2005;

(n)     On January 26, 2006, Brooke Corp.'s Board of Directors declared a $.16/share quarterly cash dividend on the Company's common stock, which was paid on February 22, 2006;

(o)     On April 27, 2006, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on May 26, 2006;

(p)     On July 27, 2006, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on August 24, 2006;

(q)     On October 26, 2006, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on November 21, 2006;

(r)     On January 25, 2007, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on February 22, 2007;

(s)     On April 26, 2007, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on May 25, 2007;

(t)     On July 30, 2007, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on August 23, 2007;

(u)     On October 26, 2007, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on November 23, 2007; and

(v)    On January 25, 2008, Brooke Corp.'s Board of Directors declared a $.18/share quarterly cash dividend on the Company's common stock, which was paid on February 22, 2008.

188.   As of December 31, 2006, Robert Orr represented in SEC filings that he beneficially owned approximately 46.6% of Brooke Corp.'s outstanding common stock.  As of December 31, 2006, there were 12,553,726 outstanding shares of Brooke Corp. common stock. Accordingly, when Brooke Corp.'s Board of Directors, of which Robert Orr was the chairman, declared a $.18/share quarterly dividend, which it did for the last three quarters of 2006 and each quarter in 2007, Robert Orr stood to share in approximately $1.053M for each dividend payment.

189.   At the time of each dividend payment, Brooke was insolvent and the Brooke Corp. Board of Directors either knew, or through the exercise of reasonable diligence, should have known, that Brooke was insolvent.

190.   As early as August 2006 and as late as March 2008, Kutak provided legal advice to Brooke and the Brooke Corp. Board of Directors regarding the legality and advisability of declaring dividends under Kansas law.

191.   On several occasions, prior to declaring a dividend, Brooke and the Brooke Corp. Board of Directors sought Kutak's advice regarding the propriety of declaring and paying a dividend.

192.   In providing such legal advice, Kutak recognized that Brooke's financial condition was paramount to a determination of whether dividends were proper under Kansas law.

193.   Based on its knowledge that Brooke was improperly recognizing 100% of Initial Franchise Fee revenue in the year that revenue were received, Kutak knew or should have known

that Brooke was insolvent at the time the Brooke Corp. Board of Directors declared and paid the above-referenced dividends.

194.    Kutak failed to advise Brooke or the Brooke Corp. Board of Directors that payment of the above-referenced dividends was unlawful under Kansas law in light of Brooke's insolvency.

195.    Kutak's failure to properly advise Brooke and the Brooke Corp. Board of Directors regarding the payment of dividends resulted in the payment of dividends that were unlawful under Kansas law.

### VII.    *Brooke's 2005 Public Offering*

196.    In January 2005, in order to raise additional capital for Brooke, Brooke's management, including Robert Orr and Leland Orr, began meeting with various underwriters to explore the possibility of a follow-on public offering of Brooke common stock.

197.    After meeting with various underwriters, Robert Orr sent a memorandum to the Board of Directors of Brooke Corp. recommending the engagement of Sandler O'Neill as lead manager of a follow-on public offering of Brooke common stock.

198.    Soon thereafter, Brooke invited Sandler O'Neill to serve as lead underwriter and sole book-running manager for Brooke's follow-on offering of Brooke common stock and invited Fox-Pitt Kelton and Oppenheimer to serve as co-managers (Sandler O'Neill, Fox-Pitt Kelton, and Oppenheimer collectively referred to as the "Underwriters").

199.    Almost immediately, the Underwriters began their due diligence of Brooke and its planned offering, providing Brooke's general counsel, Anita Larson, with outlines of their planned due diligence and a listing of the documents Brooke was to provide the Underwriters, which she relayed to Robert and Leland Orr.

200.    Included in the Underwriters' due diligence outlines were the issues of franchise fees, including upfront fees and recurring fees, what on-going services Brooke provided to franchisees, the controls in place to monitor franchisees, and the status of Brooke's loan portfolio.

201.    The Underwriters' planned auditor due diligence included issues regarding the background and history of Brooke's auditors, the quality of Brooke's internal controls, and any reportable conditions or material deficiencies.   The Underwriters had previously expressed concern regarding the experience of Brooke's accountants and auditors.

202.    The Underwriters also requested numerous documents, including Brooke's recent financial statements and related auditors' reports, any auditors' letters to management, and documentation of the impact of implementing various accounting standards.

203.    In addition, the Underwriters also specifically requested notes from an August 2004 meeting between Brooke's management and its auditors in which the parties discussed various accounting issues.

204.    The Underwriters then held an initial due diligence meeting with Brooke's management, including Robert and Leland Orr, on February 7, 2005, at Brooke's headquarters in Kansas.

205.    The Underwriters were experts in accounting and financial matters and had superior knowledge to Brooke and Brooke Corp.'s Board of Directors with respect to such matters.

206.    The Underwriters also conducted numerous subsequent discussions telephonically with Brooke's management, auditors, actuaries, and consultants in February, March and April

2005 as the Underwriters participated in drafting the 2005 S-1 in connection with the follow-on stock offering and in responding to various comments from the SEC and revising the 2005 S-1.

207.    The due diligence conducted by the Underwriters revealed or should have revealed numerous "red flags" regarding Brooke, including but not limited to areas of concern regarding Brooke's business, its accounting and revenue recognition practices, and its auditor.

208.    For example, as part of its due diligence, the Underwriters received reports from Brooke's independent auditors in which the auditors identified various material weaknesses with Brooke's internal controls following audits of Brooke's financial statements for 2002 and 2003.

209.    For 2002, Brooke's auditors cited a lack of accounting oversight, stating:

> We believe improvement is needed in the internal review and verification process of financial information provided by others.  It appears that the accounting department does not sufficiently verify or test such information placing too great of confidence on the departments, subsidiaries, and individuals from which it is submitted.

210.    The company's auditors also cited the lack of policies and procedures regarding cut-off periods for the purposes of revenue recognition, recommending that "policies be established to provide proper GAAP guidance with regards to when revenue is earned and when it should be recognized."

211.    These material weaknesses continued in 2003, as Brooke's auditors cited similar material weaknesses with Brooke's internal controls following an audit of its financial statements for 2003.

212.    For 2003, Brooke's auditors cited the lack of accounting personnel as a continuing material weakness, stating that "[t]here is a shortage of qualified, experienced individuals with accounting backgrounds to support the accounting needs of the Company" which leads to "incomplete accounting research and accounting ramifications for new business endeavors or changes in business activity."

213.   The Underwriters also received notes they requested from an August 2004 meeting between Brooke's management and its auditors in which the parties discussed various accounting issues, including the need to provide documentation of the basis for revenue recognition for franchise fees, for the establishment of loan loss reserves, for the establishment of bad debt allowances, and for the amounts written off by Brooke.

214.   The Underwriters' due diligence revealed or should have revealed numerous areas of concern regarding Brooke and its planned offering of Brooke common stock.  For example, in an April 1, 2005 internal memorandum Fox-Pitt Kelton stated as follows:

> **Adequacy of Capital Preservation Tools** – Brooke has nominally never had a loan charge-off, but has had numerous instances which required a form of work out – wherein the troubled franchisees were resuscitated by Brooke or sold off.  In addition, the company has extended the term of loan repayment to 15 years.  Finally, the company has extended numerous working capital loans to franchisees.
>
> \*          \*          \*
>
> **Local Auditor Lacks Public Offering Experience** – Although, the auditor knows the Company very well based on their long-standing relationship, the lack of public company experience may be viewed by investors and/or expose the Company to other risks.

215.   The Underwriters also identified or should have identified further potential concerns regarding Brooke, which Fox-Pitt Kelton described in an April 19, 2005 internal memorandum as follows:

> **Lack of Public Company Experience** – Unlike other recent insurance company offerings, this management team does not have any prior experience with being a public company.  Additionally, its auditor also has no other public company experience.
>
> **Internal Controls** – The Company has experienced significant growth in the last 3 years.  The Company's auditors have reported reportable conditions in regards to accounting oversight.  Brooke has significantly increased its accounting personnel and has presented the underwriters with an action plan to hire more qualified personnel.

216.   Fox-Pitt Kelton also identified the fact that Brooke's business segment that generated 80% of the Company's total revenue, Brooke Franchise, generated the bulk of its revenues from one-time franchise fees paid by new franchisees.

217.   In addition, when analyzing the capital preservation and risk mitigation tools utilized by Aleritas, Fox-Pitt Kelton highlighted as important the requirement that Brooke Franchise directly receive all commissions from insurance carriers and deduct any amounts owed from the franchisee before distributing the balance.  The Underwriters must have known that such an important tool was only useful when the commissions received by Brooke Franchise equaled or exceeded the amount owed by the franchisees.  The Underwriters learned that this was not always the case.

218.   Having been aware of the various "red flags" they discovered or should have discovered during their due diligence, and the material weaknesses with Brooke's internal controls identified by its independent auditors, particularly controls related to Brooke's accounting and revenue recognition, the Underwriters should have applied heightened scrutiny with respect to the portions of the 2005 S-1 that addressed these issues or that should have addressed these issues.

219.   On April 21, 2005, Brooke filed the 2005 S-1 with the SEC in connection with the public offering.

220.   The 2005 S-1, which the Underwriters helped draft and approved, does not include these "red flags" and does not identify all of the risks and concerns that the Underwriters had earlier identified for themselves, presenting a misleading picture of Brooke.

221.   The 2005 S-1 touts Brooke's "integrated franchise and lending operations" which allows Brooke to detect and correct financial difficulty experienced by borrowers, thereby

minimizing credit losses.  The 2005 S-1, however, does not disclose the numerous workouts, loan extensions, and advances Brooke was forced to make and which the Underwriters internally cited as a concern.

222.    The 2005 S-1 also omits the fact that Brooke's auditors lacked experience auditing public companies and makes no mention of the various reportable conditions identified by the auditors in the years preceding the offering.  Upon information and belief, the Brooke entities were SSC's only publicly traded client.

223.    The 2005 S-1 also touts the experience of Brooke's management team, but fails to identify the management team's lack of experience managing a public company as a risk factor despite the fact that the Underwriters identified this as a risk.

224.    In addition, despite having concerns regarding Brooke's revenue recognition practices, the 2005 S-1 prepared by the Underwriters includes financial statements which improperly recognize revenue.  The 2005 S-1 discloses that revenue from Initial Franchise Fees are recognized immediately, but then goes on to falsely state that such revenue is recognized immediately because Brooke has no further obligations to the franchisees.  This statement is inaccurate, fails to comply with GAAP's revenue recognition requirements, and results in materially misleading financial statements.

225.    Perhaps most importantly, the 2005 S-1 fails to disclose that Brooke was insolvent at the time of the follow-on offering when Brooke's improper accounting practices are considered.

226.    After receiving comments from the SEC regarding Brooke's 2005 S-1, the Underwriters assisted Brooke's management in responding to the SEC's comments, including

comments regarding non-GAAP financial measures, recurring vs. non-recurring revenues, and franchise fees, and in drafting an amendment to the 2005 S-1.

227.    Kutak also performed its own due diligence review of Brooke in connection with the proposed public offering of Brooke Corp. common stock and provided legal advice to Brooke regarding the public offering and drafted, edited, and reviewed the 2005 S-1.

228.    The 2005 S-1 also stated that Kutak would provide an opinion regarding the legality of the securities to be registered.

229.    Through its due diligence review and its work preparing Brooke's SEC filings, as detailed above, Kutak knew Brooke was insolvent when it proposed the public offering of Brooke Corp. common stock, when it effectuated the public offering, and when it filed the 2005 S-1.

230.    Kutak failed to advise Brooke that it was insolvent at the time of the public offering and of the impropriety of the public offering.

231.    On July 28, 2005, Kutak provided the following opinion to Brooke and the SEC in connection with the 2005 S-1:

> [W]e are of the opinion that the Shares have been duly authorized and, when the Registration Statement becomes effective under the Securities Act, and when appropriate certificates representing the Shares are duly countersigned and registered by the Company's transfer agent/registrar and delivered to the Company's underwriters against payment for the agreed consideration therefore in accordance with the underwriting agreement, the Shares will be validly issued, fully paid and nonassessable.

232.    In August 2005, Brooke finalized and executed an underwriting agreement with the Underwriters.

233.    On August 9, 2005, the SEC declared the 2005 S-1 effective and Brooke announced the pricing of its follow-on offering of 2,500,000 shares of Brooke common stock at a price of $11.50 per share.

234.    On August 15, 2005, Brooke announced the completion of its follow-on offering of 2,500,000 shares of Brooke Corp. common stock and, on August 22, 2005, the Underwriters exercised their right to purchase their over-allotment, and purchased an additional 375,000 shares of common stock.

235.    The gross proceeds of the offering were $28,750,000.00.

236.    The offering allowed Brooke to continue to operate beyond the point when it should have liquidated, thereby damaging Brooke by prolonging Brooke's corporate life and allowing it to incur additional debts and waste the capital raised through the follow-on offering.

237.    Between 2004 and 2008, and because both Brooke and its lenders believed that Brooke was solvent, Brooke took on additional debt, and went from a company that was on the brink of solvency to a company that has over $450 million in claims against it and its affiliates.

## VIII.   Brooke's Private Offerings

238.    On September 15, 2006, in a private placement transaction, Brooke entered into a Securities Purchase Agreement with HBK Investments, LP ("HBK"), an accredited institutional investor.

239.    Pursuant to the Securities Purchase Agreement, Brooke sold to HBK 20,000 shares of Series 2006 Preferred Stock, with an aggregate stated value of $20 million.  Brooke received $14.6 million from HBK, less fees and expenses.  These proceeds were used by Brooke to repay a $10 million promissory note issued during the second quarter of 2006 for the purpose of contributing capital to Brooke Credit.

240.    In the Securities Purchase Agreement, Brooke represented that Brooke Corp. and its subsidiaries, individually and on a consolidated basis, were not insolvent as of the date of the Securities Purchase Agreement and would not become insolvent as a result of entering into the Securities Purchase Agreement.

241.     On October 11, 2006, Brooke filed a Form S-1 Registration Statement with the SEC in connection with Securities Purchase Agreement between Brooke and HBK ("2006 S-1").

242.     The 2006 S-1 provided that Kutak would "pass upon certain matters regarding the validity of the shares of common stock being offered" in the prospectus.  On October 11, 2006, Kutak provided the following opinion to Brooke and the SEC: "[W]e are of the opinion that, when issued, the Shares will be legally issued, fully paid and non-assessable."

243.     On November 3, 2006, Brooke filed a prospectus relating to an offering of 1,835,296 shares of Brooke Corp. common stock, including 1,529,413 shares issuable upon the conversion of preferred stock owned by HBK, and 305,883 shares issuable upon the exercise of warrants owned by HBK ("2006 Prospectus").  This registration was done in conjunction with the private placement offering with HBK.

244.     Brooke was insolvent when it entered into the Securities Purchase Agreement and when it filed the 2006 S-1 and the 2006 Prospectus.

245.     Kutak acted as transaction counsel to Brooke in connection with the Securities Purchase Agreement, provided legal advice to Brooke regarding the Securities Purchase Agreement, the 2006 S-1 and the 2006 Prospectus, and assisted Brooke in preparing and filing the 2006 S-1 and the 2006 Prospectus.

246.     Kutak drafted, revised, and reviewed the Securities Purchase Agreement, the 2006 S-1 and the 2006 Prospectus.

247.     Kutak knew or should have known that Brooke's representation in the Securities Purchase Agreement that Brooke was not insolvent was materially false.

248.    Kutak knew or should have known that Brooke was insolvent when Brooke entered into the Securities Purchase Agreement, issued its 2006 Prospectus, and filed the 2006 S-1.

249.    Kutak failed to advise Brooke that the Securities Purchase Agreement contained material misrepresentations regarding the solvency of Brooke.

250.    Additionally, Kutak failed to advise Brooke that it was insolvent at the time of the Securities Purchase Agreement and of the impropriety of the Securities Purchase Agreement.

251.    Through the Securities Purchase Agreement, Brooke received a cash infusion sufficient to prolong Brooke's corporate life and to allow the corporation to incur more debt and become more insolvent.

252.    On June 27, 2007, Brooke filed a prospectus relating to the sale of 1.5 million shares of common stock at a total offering size of $20,250,000 in a negotiated private placement transaction with institutional investors led by Jayhawk Institutional Partners, L.P. ("2007 Prospectus").

253.    The 2007 Prospectus provided that Kutak would "pass upon certain matters regarding the validity of the shares of common stock being offered. . . ."  On July 27, 2007, Kutak provided the following opinion to Brooke and the SEC: "[W]e are of the opinion that, when issued, the Shares will be legally issued, fully paid and non-assessable."

254.    Brooke was insolvent when it entered into the private placement transaction and when it filed the 2007 Prospectus.

255.    Kutak acted as transaction counsel to Brooke in connection with the private placement transaction, provided legal advice to Brooke regarding the private placement

transaction and the 2007 Prospectus, and assisted Brooke in drafting, editing, reviewing, and filing the 2007 Prospectus.

256.    Kutak knew or should have known that Brooke was insolvent when Brooke entered into the private placement transaction and filed the 2007 Prospectus.

257.    Kutak failed to advise Brooke of its insolvency and of the impropriety of the 2007 private placement transaction.

258.    Through the 2007 private placement transaction between Brooke and institutional investors led by Jayhawk Institutional Partners, L.P., Brooke received a cash infusion sufficient to prolong Brooke's corporate life and to allow the corporation to incur more debt and become more insolvent.

259.    On May 28, 2008, Brooke Corp. filed a prospectus relating to an offering of 15,934,706 shares of common stock to existing Brooke Corp. shareholders ("2008 Prospectus").

260.    The 2008 Prospectus provided that Kutak would "pass upon certain matters regarding the validity of the shares of common stock being offered. . . ."  On May 28, 2008, Kutak provided the following opinion to Brooke and the SEC:

> [W]e are of the opinion that:  (a) the issuance of the Rights has been duly authorized and when the Rights are distributed as contemplated by the Prospectus, they will be validly issued; and (b) the issuance and sale of the Common Stock upon exercise of the Rights have been duly authorized and, when (i) the holders of the Common Stock have complied with the terms of the Rights Certificates in connection with the exercise thereof, and (ii) the shares of Common Stock are issued and paid for, the Common Stock will be validly issued, fully paid and nonassessable.

261.    Kutak knew or should have known that Brooke was insolvent when it effectuated the stock offering to existing Brooke shareholders and when it filed the 2008 Prospectus.

262.     Kutak provided legal advice to Brooke regarding the stock offering to existing Brooke shareholders and the 2008 Prospectus, and assisted Brooke in drafting, editing, reviewing, and filing the 2008 Prospectus.

263.     Kutak failed to advise Brooke of its insolvency and of the impropriety of the stock offering to existing Brooke shareholders and the 2008 Prospectus.

264.     Through the stock offering to existing Brooke Corp. shareholders, Brooke Corp. received a cash infusion sufficient to prolong Brooke's corporate life and to allow the corporation to incur more debt and become more insolvent.

265.     After being driven further into insolvency, Brooke Corp. and Brooke Capital declared bankruptcy on October 28, 2008 and Brooke Investments declared bankruptcy on November 3, 2008.

## COUNT I – IMPROPER DIVIDEND PAYMENTS
### (Against Brooke Corp. Board of Directors)

266.     The Trustee re-alleges and incorporates paragraphs 1 through 265 as if fully set forth herein.

267.     Pursuant to K.S.A. § 17-6420, the directors of a corporation may declare and pay dividends upon the shares of its capital stock either (1) out of its surplus, or (2) in case there is no surplus, out of its net profits for the fiscal year in which the dividend is declared.

268.     K.S.A. § 17-6424 provides that, in the case of any willful or negligent violation of K.S.A. §17-6410 or § 17-6423 (which includes the payment of dividends pursuant to K.S.A. § 17-6424), the directors shall be jointly and severally liable, for the full amount of the dividend unlawfully paid, with interest, from the time such liability accrued.

269.     As detailed above, Brooke Corp.'s Board of Directors declared and paid numerous cash dividends on the Company's common stock between February 2003 and January 2008, including regular quarterly and special cash dividends.

270.     At the time of each of the above-referenced dividend payments, Brooke Corp. was insolvent.

271.     At the time of the above-referenced dividend payments, the Board of Directors for Brooke Corp. either knew, or through the exercise of reasonable diligence, should have known, that Brooke Corp. was insolvent.

272.     In paying the above-referenced dividends, Brooke Corp.'s Board of Directors either willfully paid dividends knowing that Brooke was insolvent, or negligently paid dividends when it should have known that Brooke was insolvent.

273.     As a result of the unlawful payments of dividends, as referenced above, the members of the Brooke Corp. Board of Directors are liable, jointly and severally, for the entire amount of the dividends paid.

## COUNT II – BREACH OF FIDUCIARY DUTY (WASTE OF ASSETS/DIVIDENDS)
### (Against Brooke Corp. Board of Directors)

274.     The Trustee re-alleges and incorporates paragraphs 1 through 273 as if fully set forth herein.

275.     The Brooke Corp. Board of Directors has a fiduciary duty to be informed, and to make careful and informed decisions after careful consideration and deliberation of relevant issues, and, when appropriate, seek the input of legal and financial experts.

276.     The Brooke Corp. Board of Directors also have a fiduciary duty of care including the duty to act in the best interest of the Company, to not waste corporate assets and to not declare and pay dividends that are unlawful under relevant law.

277.     The Brooke Corp. Board of Directors breached its fiduciary duties by:

    (a)    Failing to address the practice of paying the franchisees Monthly Expense shortfalls and permitting Brooke to pay the franchisees Monthly Expense shortfalls when it was not being compensated or reimbursed for such expenditures; and

    (b)    Declaring and paying dividends that were unlawful under Kansas law.

278.     As a result of the above-referenced breaches, the Brooke Corp. Board of Directors permitted Brooke to waste its own assets to the detriment of Brooke and its creditors.

279.     Paying the franchisee's Monthly Expense shortfalls and declaring and paying dividends that were unlawful under Kansas law caused, or contributed to, Brooke's insolvency.

280.     As a result of Brooke paying its franchisee's Monthly Expense shortfalls and paying dividends that were unlawful under Kansas law, Brooke was damaged in excess of $10,000,000.00.

### COUNT III – BREACH OF FIDUCIARY DUTY (FINANCIAL OVERSIGHT)
### (Against Brooke Corp. Board of Directors)

281.     The Trustee re-alleges and incorporates paragraphs 1 through 280 as if fully set forth herein.

282.     The Brooke Corp. Board of Directors and Audit Committee have a fiduciary duty to be informed, to make careful and informed decisions after careful consideration and deliberation of relevant issues, and, when appropriate, to seek the input of legal and financial experts.

283.     The Brooke Corp. Board of Directors and the Audit Committee for the Brooke Corp. Board of Directors have a fiduciary duty of care to act in the best interest of Brooke Corp.

284.     Additionally, the Audit Committee has a duty to:

(a)    Assist the Brooke Corp. Board of Directors in fulfilling its oversight responsibilities for financial matters;

(b)    Assist the Brooke Corp. Board of Directors in the specific oversight of the integrity of the financial statements of Brooke Corp.;

(c)    Ensure that Brooke Corp. complies with all legal and regulatory requirements;

(d)    Ensure that the external auditors are independent and competent;

(e)    Oversee Brooke Corp.'s accounting and reporting practices;

(f)    Ensure the quality and integrity of Brooke Corp.'s financial statements;

(g)    Select, oversee, evaluate, and replace Brooke Corp.'s external auditors, when necessary;

(h)    Effectively communicate with the external auditors and management about Brooke Corp.'s financial position; and

(i)    Retain qualified and competent outside financial consultants, including the retention of an independent, qualified, financial expert consultants, to help them interpret and analyze the audit reports prepared by Brooke Corp.'s external auditors.

285.    The Brooke Corp. Board of Directors and the Audit Committee breached their respective duties by:

(a)    Not making informed decisions regarding the competence of the external auditors;

(b)    Not making informed decisions regarding the accuracy of Brooke Corp.'s financial statements prepared by the external auditors;

(c)    Improperly approving financial statements that were materially misleading and did not properly recognize revenue or properly account for bad loans;

(d)    Failing to ensure that the financial statements accurately reflected the financial condition of Brooke Corp.; and

(e)    Failing to ensure that Brooke Corp.'s financial statements complied with GAAP and relevant SEC rules.

286.    As a result of the Brooke Corp. Board of Directors' and the Audit Committee's above-referenced breaches, the Brooke Corp. Board of Directors and the Audit Committee approved the Company's materially misleading financial statements from 2004-2008, all of which represented that Brooke was solvent, when in fact, Brooke Corp. was insolvent.

287.    As a result of Brooke Corp.'s perceived solvency, Brooke Corp. continued to operate business as usual and continued its aggressive growth plan.

288.    Over the next four years, and until Brooke Corp. filed for bankruptcy protection in October 2008, Brooke Corp. went deeper into insolvency, was ultimately forced to file bankruptcy, and now has claims in excess of $450M against the Debtors' estates.

## COUNT IV – DEEPENING INSOLVENCY
### (Against Brooke Corp. Board of Directors)

289.    The Trustee re-alleges and incorporates paragraphs 1 through 288 as if fully set forth herein.

290.    The Brooke Corp. Board of Directors has a fiduciary duty to be informed, to make careful and informed decisions after careful consideration and deliberation of relevant issues, and, when appropriate, to seek the input of legal and financial experts.

291.    The Brooke Corp. Board of Directors also has a fiduciary duty of care, including the duty to act in the best interest of Brooke Corp., to not waste corporate assets and to not declare and pay dividends that are unlawful under relevant law.

292.    For the reasons more fully set forth above, the Brooke Corp. Board of Directors breached their fiduciary duties by, among other things:

> (a)    Not making informed decisions regarding the competence of the external auditors;

> (b)    Not making informed decisions regarding the accuracy of Brooke Corp.'s financial statements prepared by the external auditors;

> (c)    Improperly approving financial statements that were materially misleading and did not properly recognize revenue or properly account for bad loans;

> (d)    Failing to ensure that the financial statements accurately reflected the financial condition of Brooke Corp.;

> (e)    Failing to ensure that Brooke Corp.'s financial statements complied with GAAP and relevant SEC rules;

> (f)    Failing to recognize Brooke Corp.'s insolvency in light of the above failures; and

> (g)    Failing to recognize the impropriety of the 2005 public offering, the Securities Purchase Agreement, the 2007 private placement transaction, and the 2008 offering of common stock to existing Brooke shareholders (collectively, the "Stock Offerings") in light of Brooke Corp.'s financial condition.

293.    As a result of these breaches, Brooke's corporate life was unlawfully prolonged.

294.    Indeed, Brooke's improper accounting practices relating to the recognition of Initial Franchise Fee revenue and bad loans led lenders and investors to mistakenly believe that Brooke was solvent which, in turn, allowed Brooke to incur more debt and become more insolvent, thereby unlawfully prolonging Brooke's corporate life.

295.    Moreover, the Stock Offerings provided Brooke with a cash infusion sufficient to allow Brooke to incur more debt and become more insolvent, thereby unlawfully prolonging Brooke's corporate life.

296.    If the unlawful prolongation of Brooke's corporate life had not occurred, the value of Brooke could have been realized.

297.    The unlawful prolongation of Brooke's corporate life has caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of $10 million.

## COUNT V – BREACH OF FIDUCIARY DUTY (WASTE OF ASSETS)
### (Against Brooke Capital Board of Directors)

298.    The Trustee re-alleges and incorporates paragraphs 1 through 297 as if fully set forth herein.

299.    The Brooke Capital Board of Directors had a fiduciary duty to be informed, to make careful and informed decisions after careful consideration and deliberation of relevant issues, and, when appropriate, to seek the input of legal and financial experts.

300.    The Brooke Capital Board of Directors also had a fiduciary duty of care including the duty to act in the best interest of the Company and to not waste corporate assets.

301.    The Brooke Capital Board of Directors breached its fiduciary duties by:

(a)    Failing to address the practice of paying the franchisees Monthly Expense shortfalls and permitting Brooke to pay the franchisees Monthly Expense

shortfalls when it was not being compensated or reimbursed for such expenditures; and

(b)    Failing to provide proper oversight regarding the integrity of the financial statements of Brooke Capital, in that Brooke Capital improperly recognized all Initial Franchise Fee revenue in the year it was received and failed to properly establish loan loss reserves;

(c)    Failing to ensure that Brooke Capital complied with all legal and regulatory requirements;

(d)    Failing to ensure that the external auditors are independent and competent;

(e)    Failing to oversee Brooke Capital's accounting and reporting practices such that Brooke Capital was improperly recognizing all Initial Franchise Fee revenue in the year it was received and failing to properly establish loan loss reserves;

(f)    Failing to ensure the quality and integrity of Brooke Capital's financial statements;

(g)    Failing to retain qualified and competent outside financial consultants, including the retention of an independent, qualified, financial expert consultants, to help them interpret and analyze the audit reports prepared by Brooke Capital's external auditors;

(h)    Improperly approving financial statements that were materially misleading and did not properly recognize revenue or properly account for bad loans;

(i)    Failing to ensure that Brooke Capital's financial statements accurately reflected the financial condition of Brooke Capital; and

(j)     Failing to ensure that Brooke Capital's financial statements complied with GAAP and relevant SEC rules.

302.    As a result of the above-referenced breaches, Brooke Capital's Board of Directors approved Brooke Capital's materially misleading financial statements from 2004-2008, all of which were subsequently incorporated into Brooke Corp.'s financial statements, and included in Brooke Corp.'s public filings.

303.    As a result of the above-referenced breaches, the Brooke Capital Board of Directors permitted Brooke to waste its own assets to the detriment of Brooke, and created the impression that because of Brooke Capital's revenues, Brooke Corp. was solvent.

304.    Paying the franchisee's Monthly Expense shortfalls, improperly recognizing Initial Franchise Fee revenue, and failing to establish loan loss reserves caused, or contributed to, Brooke's insolvency.

305.    As a result of the above-referenced breaches of fiduciary duty by Brooke Capital's Board of Directors, Brooke was damaged in excess of $10 million.

## COUNT VI - MALPRACTICE
### (Against Kutak)

306.    The Trustee re-alleges and incorporates paragraphs 1 through 305 as if fully set forth herein.

307.    An attorney-client relationship existed between Kutak and Brooke.

308.    Pursuant to the attorney-client relationship between Kutak and Brooke, Kutak owed Brooke the duty to exercise ordinary care, skill and knowledge which members of the legal profession ordinarily possess.

309.    Kutak's duty to exercise ordinary care, skill and knowledge included the duty to make a reasonable effort to independently verify the facts on which Kutak's legal advice was

based, the duty to give advice when necessary to prevent or rectify unlawful or improper acts of Brooke, and the duty to investigate any "red flags" that arose during the course of Kutak's representation of Brooke.

310.    For the reasons more fully set forth above, Kutak breached its duty to exercise ordinary care, skill and knowledge during the course of its representation of Brooke by, among other things:

    (a)    Failing to advise Brooke of the impropriety of Brooke's policies and procedures relating to the recognition of Initial Franchise Fee revenue at the inception of the franchise relationship and Brooke's related SEC disclosures;

    (b)    Failing to advise Brooke of its insolvency in light of its improper recognition of Initial Franchise Fee revenue;

    (c)    Failing to investigate Brooke's financial health in connection with the Stock Offerings and related SEC disclosures;

    (d)    Failing to advise Brooke of the impropriety of the Stock Offerings and related SEC disclosures;

    (e)    Failing to investigate Brooke's financial health in connection with dividends approved by the Brooke Corp. Board of Directors; and

    (f)    Failing to advise Brooke and/or the Brooke Corp. Board of Directors that the dividends approved by the Brooke Corp. Board of Directors were unlawful under Kansas law.

311.    Kutak's breaches of its duty to exercise ordinary care, skill and knowledge during the course of its representation of Brooke have caused irreparable damage to Brooke, including

Brooke's deepening insolvency, and to Brooke's general unsecured creditors in an amount in excess of $10 million.

## COUNT VII – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Kutak)

312.   The Trustee re-alleges and incorporates paragraphs 1 through 311 as if fully set forth herein.

313.   The Brooke Corp. Board of Directors owes Brooke a fiduciary duty of care including the duty to act in the best interest of the Company, to be informed, and to make careful and informed decisions after careful consideration and deliberation of relevant issues, and, when appropriate, to seek the input of legal and financial experts, and the duty to not waste corporate assets.

314.   The Brooke Corp. Board of Directors also owes Brooke Corp. a duty to not declare and pay dividends that are unlawful under relevant law.

315.   As set forth in Counts II and III, the Brooke Corp. Board of Directors breached its fiduciary duties by, among other things:

   (a)   Improperly approving financial statements that did not properly recognize revenue;

   (b)   Failing to ensure that Brooke Corp.'s financial statements accurately reflected the financial condition of the Company;

   (c)   Failing to ensure that Brooke Corp.'s financial statements complied with GAAP and relevant SEC rules; and

   (d)   Declaring and paying dividends that were unlawful under Kansas law.

316.   Kutak knew or should have known of the above-referenced breaches.

317.   Indeed, Kutak knew that Brooke's recognition of Initial Franchise Fee revenue at the inception of the franchise relationship was improper under GAAP and relevant SEC rules, resulted in Brooke appearing to have more equity than it really did, and resulted in materially misleading representations regarding Brooke's financial condition.

318.   Moreover, based on its knowledge that Brooke was improperly recognizing Initial Franchise Fee revenue at the inception of the franchise relationship, Kutak knew or should have known that Brooke was insolvent at the time the Brooke Corp. Board of Directors declared and paid the dividends referenced in paragraph 187(q) through 187(v).

319.   Nevertheless, Kutak knowingly and substantially assisted the Brooke Corp. Board of Directors in continuing the practice of recognizing Initial Franchise Fee revenue at the inception of the franchise relationship and knowingly and substantially assisted the Brooke Corp. Board of Directors in declaring and paying dividends that were unlawful under Kansas law.

320.   The Brooke Corp. Board of Directors' and Kutak's concerted actions have caused irreparable damage to Brooke, including Brooke's deepening insolvency, and to Brooke's general unsecured creditors in an amount in excess of millions of dollars.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
### (Against Kutak)

321.   The Trustee re-alleges and incorporates paragraphs 1 through 320 as if fully set forth herein.

322.   An attorney-client relationship existed between Kutak and Brooke.

323.   Pursuant to the attorney-client relationship between Kutak and Brooke, Kutak owed certain fiduciary duties to Brooke.

324.   Kutak's fiduciary duties to Brooke included the duty to exercise the highest degree of fidelity and good faith on account of the trust and confidence imposed upon Kutak, and the duty to properly, competently, and adequately counsel, advise, and represent Brooke.

325.   Kutak's fiduciary duties to Brooke also included the duty to exercise ordinary care, skill and knowledge, the duty to make a reasonable effort to independently verify the facts on which Kutak's legal advice was based, the duty to give advice when necessary to prevent or rectify unlawful or improper acts of Brooke, and the duty to investigate any "red flags" that arose during the course of Kutak's representation of Brooke.

326.   For the reasons more fully set forth above, Kutak breached its fiduciary duties to Brooke by, among other things:

(a)   Failing to advise Brooke of the impropriety of Brooke's policies and procedures relating to the recognition of Initial Franchise Fee revenue at the inception of the franchise relationship and Brooke's related SEC disclosures;

(b)   Failing to advise Brooke of its insolvency in light of its improper recognition of Initial Franchise Fee revenue;

(c)   Failing to investigate Brooke's financial health in connection with the Stock Offerings and related SEC disclosures;

(d)   Failing to investigate and to advise Brooke of the impropriety of the Stock Offerings and related SEC disclosures;

(e)   Failing to investigate Brooke Corp's financial health in connection with dividends approved by the Brooke Corp. Board of Directors; and

(f)   Failing to advise Brooke Corp. and/or the Brooke Corp. Board of Directors that the dividends approved by the Brooke Corp. Board of Directors were unlawful under Kansas law.

327.   Kutak's breaches of its fiduciary duties to Brooke have caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of millions of dollars.

## COUNT IX – DEEPENING INSOLVENCY
### (Against Kutak)

328.   The Trustee re-alleges and incorporates paragraphs 1 through 327 as if fully set forth herein.

329.   Brooke was insolvent during the 2004 through 2008 period of time in which Kutak was representing Brooke and providing legal advice to Brooke.

330.   For the reasons more fully set forth above, Kutak knew or should have known that Brooke was insolvent during the 2004 through 2008 period of time in which Kutak was representing Brooke and providing legal advice to Brooke

331.   Pursuant to the attorney-client relationship between Kutak and Brooke, Kutak owed Brooke the duty to exercise ordinary care, skill and knowledge which members of the legal profession ordinarily possess.

332.   Kutak's duty to exercise ordinary care, skill and knowledge included the duty to make a reasonable effort to independently verify the facts on which Kutak's legal advice was based, the duty to give advice when necessary to prevent or rectify unlawful or improper acts of Brooke, and the duty to investigate any "red flags" that arose during the course of Kutak's representation of Brooke.

333.   Pursuant to the attorney-client relationship between Kutak and Brooke, Kutak had a fiduciary duty to exercise the highest degree of fidelity and good faith on account of the trust

and confidence imposed upon Kutak, and the duty to properly, competently, and adequately counsel, advise, and represent Brooke.

334.    For the reasons more fully set forth above, Kutak breached the above duties during the course of its representation of Brooke by, among other things:

        (a)    Failing to investigate and to advise Brooke of the impropriety of Brooke's policies and procedures relating to the recognition of Initial Franchise Fee revenue at the inception of the franchise relationship and Brooke's related SEC disclosures;

        (b)    Failing to advise Brooke of its insolvency in light of its improper recognition of Initial Franchise Fee revenue; and

        (c)    Failing to investigate and to advise Brooke of the impropriety of the Stock Offerings and related SEC disclosures.

335.    As a result of these breaches, Brooke's corporate life was unlawfully prolonged.

336.    Indeed, Brooke's practice of fully recognizing Initial Franchise Fee revenue at the inception of the franchise relationship led lenders and investors to mistakenly believe that Brooke was solvent which, in turn, allowed Brooke to incur more debt and become more insolvent, thereby unlawfully prolonging Brooke's corporate life.

337.    Finally, the Stock Offerings provided Brooke with a cash infusion sufficient to allow Brooke to incur more debt and become more insolvent, thereby unlawfully prolonging Brooke's corporate life.

338.    If the unlawful prolongation of Brooke's corporate life had not occurred, the value of Brooke could have been realized.

339.   The unlawful prolongation of Brooke's corporate life has caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of millions of dollars.

## COUNT X – PREFERENTIAL TRANSFER (11 U.S.C. § 547)
### (Against Kutak)

340.   The Trustee re-alleges and incorporates paragraphs 1 through 339 as if fully set forth herein.

341.   Over time, Brooke paid hundreds of thousands of dollars to Kutak for legal services.

342.   During the 90-day period preceding their bankruptcy filings, Brooke Corp. and Brooke Capital made the following payments to Kutak:

| Payor | Payee | Amount | Chk_date | Clr_date | Acct_num | Chk_num |
|-------|-------|--------|----------|----------|----------|---------|
| Brooke Capital Corporation | Kutak Rock LLP | $99.00 | 5/23/2008 | 9/15/2008 | 8000751 | 55123280 |
| Brooke Capital Corporation | Kutak Rock LLP | $198.00 | 9/11/2008 | 9/15/2008 | 8000751 | 55124878 |
| Brooke Capital Corporation | Kutak Rock LLP | $7,128.00 | 9/11/2008 | 9/15/2008 | 8000751 | 55127184 |
| Brooke Capital Corporation | Kutak Rock LLP | $11,119.50 | 9/11/2008 | 9/15/2008 | 8000751 | 55127185 |
| Brooke Corporation | Kutak Rock, LLP | $16,159.50 | 5/27/2008 | 9/12/2008 | 8000913 | 101206 |
| Brooke Corporation | Kutak Rock, LLP | $218.40 | 5/27/2008 | 9/12/2008 | 8000913 | 101207 |
| Brooke Corporation | Kutak Rock, LLP | $1,824.90 | 5/27/2008 | 9/12/2008 | 8000913 | 101209 |
| Brooke Corporation | Kutak Rock, LLP | $2,111.00 | 5/27/2008 | 9/12/2008 | 8000913 | 101211 |
| Brooke Corporation | Kutak Rock, LLP | $24,771.15 | 5/27/2008 | 9/12/2008 | 8000913 | 101212 |
| Brooke Corporation | Kutak Rock, LLP | $12,452.00 | 5/27/2008 | 9/15/2008 | 8000913 | 101205 |
| Brooke Corporation | Kutak Rock, LLP | $924.00 | 5/27/2008 | 9/15/2008 | 8000913 | 101208 |
| Brooke Corporation | Kutak Rock, LLP | $5,535.80 | 6/16/2008 | 9/12/2008 | 8000913 | 101266 |
| Brooke Corporation | Kutak Rock, LLP | $1,984.80 | 6/16/2008 | 9/15/2008 | 8000913 | 101264 |
| Brooke Corporation | Kutak Rock, LLP | $6,931.34 | 6/16/2008 | 9/15/2008 | 8000913 | 101265 |
| Brooke Corporation | Kutak Rock, | $253.00 | 6/16/2008 | 9/15/2008 | 8000913 | 101267 |

**CATEGORY D**

| Payor | Payee | Amount | Chk_date | Clr_date | Acct_num | Chk_num |
|-------|-------|--------|----------|----------|----------|---------|
| | LLP | | | | | |
| Brooke Corporation | Kutak Rock, LLP | $37,632.42 | 6/16/2008 | 9/15/2008 | 8000913 | 101268 |
| Brooke Corporation | Kutak Rock, LLP | $15,606.16 | 9/11/2008 | 9/15/2008 | 8000913 | 101384 |
| Brooke Corporation | Kutak Rock, LLP | $3,134.54 | 9/11/2008 | 9/15/2008 | 8000913 | 101385 |
| Brooke Corporation | Kutak Rock, LLP | $6,863.00 | 9/11/2008 | 9/15/2008 | 8000913 | 101386 |
| Brooke Corporation | Kutak Rock, LLP | $3,829.19 | 9/11/2008 | 9/15/2008 | 8000913 | 101387 |
| Brooke Corporation | Kutak Rock, LLP | $7,794.00 | 9/11/2008 | 9/15/2008 | 8000913 | 101388 |
| Brooke Corporation | Kutak Rock, LLP | $507.50 | 9/11/2008 | 9/15/2008 | 8000913 | 101389 |
| Brooke Corporation | Kutak Rock, LLP | $32,700.49 | 9/11/2008 | 9/15/2008 | 8000913 | 101390 |
| Brooke Corporation | Kutak Rock, LLP | $3,026.48 | 9/11/2008 | 9/15/2008 | 8000913 | 101391 |
| | **Total:** | **$202,804.17** | | | | |

343.   Of these monies, Brooke Capital paid $18,544.50 while Brooke Corp. paid $184,259.67.

344.   It is the Trustee's express intent to avoid all transfers that may be avoided and recovered from Kutak under Chapter 5 of the Bankruptcy Code.  These include not only the transfers identified above but also any other transfers which may be discovered during the course of this litigation.

345.   The payment of these funds was on account of the antecedent debt that Brooke owed to Kutak for legal services that Kutak had previously rendered.

346.   Kutak was a creditor of Brooke at the time the transfers were made given the prior unpaid legal services that Kutak had rendered for Brooke.

347.   As more fully detailed above, Brooke was continuously insolvent during the four-year period of time preceding the Debtors' bankruptcy filings.

348.    Given the number of claims filed against the Debtors' estates as compared to known and potential assets, the Trustee has determined that unsecured creditors will not receive a full distribution from the Debtors' estates for their respective claims.  As such, the transfers identified above enabled Kutak to receive more than it otherwise would have received had the payments not been made and Kutak had simply received a distribution from the respective Chapter 7 bankruptcy estates.

349.    The transfers (including, but not limited to, the $202,804.17 identified above) constitute preferential transfers which are avoidable pursuant to 11 U.S.C. § 547.

## COUNT XI – CONSTRUCTIVE FRAUDULENT CONVEYANCE (11 U.S.C. §§ 544 and 548(a)(1)(B) and K.S.A. §§ 33-204(2) and 33-205(a))
### (Against Kutak)

350.    The Trustee re-alleges and incorporates paragraphs 1 through 349 as if fully set forth herein.

351.    Over time, Brooke paid hundreds of thousands of dollars to Kutak for legal services.

352.    As set forth in the preceding Count, during the 90-day period preceding their bankruptcy filings, Kutak received $18,544.50 from Brooke Capital and $184,259.67 from Brooke Corp.

353.    As detailed more fully above, the Debtors were continuously insolvent during the four-year period preceding their bankruptcy filing.

354.    Moreover, during that time, the Debtors were engaged in a business for which their remaining property was unreasonably small.  Moreover, during that time, the Debtors were incurring debts that were beyond their ability to pay as they matured.

355.   To the extent that Kutak only had an engagement letter with Brooke Corp., the payments from Brooke Capital to Kutak would have been without reasonably equivalent value because Brooke Capital would have owed no debt obligation to Kutak.

356.   Alternatively, to the extent that Kutak only had an engagement letter with Brooke Capital, the payments from Brooke Corp. to Kutak would have been without reasonably equivalent value because Brooke Corp. would have owed no debt obligation to Kutak.

357.   The transfers identified above are voidable pursuant to 11 U.S.C. § 548(a)(1)(B) and K.S.A. §§ 33-204(2) and 33-205(a).

358.   With respect to these voidable transfers, the Debtors are not limited to the 90-day period preceding their bankruptcy filing.  Rather, they are entitled to avoid all such fraudulent transfers made to Kutak during the four-year period preceding the Debtors' bankruptcy filing.  It is the Trustee's express intent to avoid all transfers that may be avoided and recovered from Kutak under Chapter 5 of the Bankruptcy Code.  These include not only the transfers identified above but also any other transfers which may be discovered during the course of this litigation.

### <u>COUNT XII – RECOVERY OF AVOIDED TRANSFERS (11 U.S.C. § 550)</u>
(Against Kutak)

359.   The Trustee re-alleges and incorporates paragraphs 1 through 358 as if fully set forth herein.

360.   The transfers that Kutak received from the Debtors (including, but not limited to, the transfers identified above) are voidable pursuant to 11 U.S.C. §§ 544, 547, and 548 and/or K.S.A. §§ 33-204(2) and 33-205(a).

361.   Pursuant to 11 U.S.C. § 550 and, the Trustee is entitled to avoid the transfers made to Kutak (including, but not limited to, the transfers identified above).

## COUNT XIII – DEEPENING INSOLVENCY
### (Against Underwriters)

362.     The Trustee re-alleges and incorporates paragraphs 1 through 361 as if fully set forth herein.

363.     At the request of the Board of Directors of Brooke Corp., Sandler O'Neill, Fox-Pitt Kelton, and Oppenheimer served as underwriters for Brooke's follow-on offering of 2,500,000 shares of common stock.

364.     In connection with their underwriting, the Underwriters conducted certain due diligence of Brooke and its planned offering.

365.     The due diligence conducted by the Underwriters revealed or should have revealed numerous "red flags" regarding Brooke, including but not limited to areas of concern regarding Brooke, its financial accounting, and its insolvency.

366.     Having been aware of the various "red flags" they discovered or should have discovered during their due diligence, the Underwriters should have applied heightened scrutiny with respect to the portions of the 2005 S-1 that addressed these issues or that should have addressed these issues.

367.     The 2005 S-1, which the Underwriters were retained to help draft and approve, however, does not identify all of the risks and concerns that the Underwriters had earlier identified for themselves and fails to disclose Brooke's improper financial accounting practices and insolvency.

368.     By presenting a misleading picture of Brooke and failing to disclose that Brooke was insolvent at the time of the follow-on offering, the 2005 S-1 allowed Brooke to raise over $27 million.

369.     This allowed Brooke to continue to operate beyond the point when it should have liquidated, thereby damaging Brooke by prolonging Brooke's corporate life and allowing it to incur additional debts and to waste the capital raised through the offering.

370.     Between 2004 and 2008, and because both Brooke and its lenders believed that Brooke was solvent, Brooke took on additional debt, and went from a company that was on the brink of solvency to a company that has over $450M in claims against it and its affiliates.

371.     The unlawful prolongation of Brooke's corporate life has caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of millions of dollars.

## COUNT XIV – NEGLIGENCE
### (Against Underwriters)

372.     The Trustee re-alleges and incorporates paragraphs 1 through 371 as if fully set forth herein.

373.     At the request of the Board of Directors of Brooke Corp., Sandler O'Neill, Fox-Pitt Kelton, and Oppenheimer served as underwriters for Brooke's follow-on offering of 2,500,000 shares of common stock.

374.     In connection with their underwriting, the Underwriters conducted certain due diligence of Brooke and its planned offering.

375.     The Underwriters performed this due diligence negligently in failing to discover Brooke's improper financial accounting practices and its insolvency.

376.     Alternatively, to the extent the Underwriters did discover Brooke's improper financial accounting practices and its insolvency, the Underwriters were negligent in failing to bring Brooke's improper financial accounting practices and its insolvency to the attention of

Brooke Corp.'s Board of Directors and in failing to ensure that the 2005 S-1 accurately addressed these issues so as not to mislead investors.

377.    By presenting a misleading picture of Brooke's finances and failing to disclose that Brooke was insolvent at the time of the follow-on offering, the 2005 S-1 allowed Brooke to raise over $27 million, thereby damaging Brooke by prolonging Brooke's corporate life and allowing it to incur additional debts and waste the capital raised through the follow-on offering.

378.    Between 2004 and 2008, and because both Brooke and its lenders believed that Brooke was solvent, Brooke incurred additional debt, and went from a company that was on the brink of solvency to a company that has over $450M in claims against it and its investors.

379.    The unlawful prolongation of Brooke's corporate life has caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of millions of dollars.

WHEREFORE, the Debtors request that the Court enter judgment in its favor and against the Defendants in an amount in excess of $75,000.00, for its costs and fees expended in this action, for pre and post-judgment interest, for its attorneys fees, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/ John J. Cruciani
_____

| | |
|---|---|
| Douglas J. Schmidt | #70002 |
| John J. Cruciani | #16883 |
| Michael D. Fielding | #20562 |
| Michael E. Norton | #17508 |
| Joshua M. Ellwanger | #21537 |

HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000; FAX (816) 983-8080
douglas.schmidt@huschblackwell.com
john.cruciani@huschblackwell.com
michael.fielding@huschblackwell.com
michael.norton@huschblackwell.com
joshua.ellwanger@huschblackwell.com
***Attorneys for Trustee***

71